**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 23, 2008

*In re* COMPLAINT OF ROVAS AGAINST
SBC MICHIGAN

_____

SBC MICHIGAN,

     Plaintiff-Appellant,

v                                                                              No. 134493

PUBLIC SERVICE COMMISSION,

     Defendant-Appellee.

_____

SBC MICHIGAN,

     Plaintiff-Appellee,

v                                                                              No. 134500

PUBLIC SERVICE COMMISSION,

     Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

This case concerns judicial review of an administrative agency's interpretation of a statute. This Court has not always been precise in articulating

the proper standard for reviewing such interpretations. However, in accordance with longstanding Michigan precedent and basic separation of powers principles, we hold and reaffirm that an agency's interpretation of a statute is entitled to "respectful consideration," but courts may not abdicate their judicial responsibility to interpret statutes by giving unfettered deference to an agency's interpretation. Courts must respect legislative decisions and interpret statutes according to their plain language. An agency's interpretation, to the extent it is persuasive, can aid in that endeavor.

In this case, the Court of Appeals did not properly review the agency's interpretation of the statute. Despite having understandable reservations about the agency's interpretation, the Court affirmed the agency's interpretation merely because it was "plausible." However, the plain language of the statute does not support the agency's interpretation. Therefore, we reverse the Court of Appeals decision to uphold the agency's construction of the statute. Under the proper interpretation of the statute, SBC Michigan (SBC)[1] did not violate the statute as the Public Service Commission (PSC) had erroneously concluded. However, we agree with and affirm the conclusion of the Court of Appeals that the PSC had no jurisdiction over wiring inside a customer's home. Thus, we remand this case to

---

[1] We will use "SBC" to refer to SBC Michigan and its predecessor, Ameritech Michigan.

the PSC with the instruction that it must modify its August 1, 2005, order to eliminate any PSC regulation of "inside wiring."

Accordingly, the Court of Appeals judgment is reversed in part and affirmed in part and the case is remanded to the PSC for further proceedings consistent with this opinion.

FACTS AND PROCEDURAL HISTORY

This case began in April 2001, when William J. and Sandra M. Rovas, SBC customers, called to report an interruption in their service. SBC sent a technician, who checked the wiring outside their home and erroneously determined that the problem was inside the customers' home. Because the technician believed that the problem was inside the home, he left a note informing the customers that they would be charged $71 for the service call. Eventually, SBC realized the error and reversed the charge, but not before sending the customers a bill for the $71.

Despite the fact that SBC reversed the erroneously sent bill, the customers filed a complaint with the PSC alleging, inter alia, a violation of § 2502(1)(a)[2] of

---

[2] MCL 484.2502(1)(a). That section provides:

(1) A provider of a telecommunication service shall not do any of the following:

(a) Make a statement or representation, including the omission of material information, regarding the rates, terms, or conditions of providing a telecommunication service that is false, misleading, or deceptive.

(continued…)

3

the Michigan Telecommunications Act, MCL 484.2101 *et seq.*[3] The PSC agreed

with the customers and found that SBC's statements to the customers that (1) the

problem was inside their home and (2) they owed SBC $71 for the service call

were both "false," and therefore, constituted violations of § 2502(1)(a). For

erroneously sending a retracted $71 bill, the PSC fined SBC $15,000 for violating

§2502(1)(a).[4]

The Court of Appeals affirmed the PSC decision in an unpublished opinion

per curiam, noting, however, that given the context of the term "false" in the

statute, "it is plausible this provision is not intended to proscribe a statement that is

simply not true or correct, but is only intended to proscribe those statements

tending to deceive or mislead."[5] Nonetheless, the Court of Appeals affirmed the

PSC because the panel believed it was "charged with giving great deference to the

PSC's construction of a statute which the Legislature has required the PSC to

(…continued)
The statute was amended by 2005 PA 235, which added a second sentence to subsection (a). That sentence states, "As used in this subdivision, 'material information' includes, but is not limited to, all applicable fees, taxes, and charges that will be billed to the end-user, regardless of whether the fees, taxes, or charges are authorized by state or federal law." The amendment is not at issue here.

[3] The other aspects of the customers' complaint are not before the Court.

[4] The PSC imposed additional penalties for other violations; however, as noted, those violations are not at issue here.

[5] *Ameritech Michigan v Pub Service Comm*, unpublished opinion per curiam of the Court of Appeals, issued June 17, 2004 (Docket No. 244742), at 2. The instant case has been decided under several different names, but the parties have not changed.

enforce, and therefore the mere establishment of an alternative interpretation of a statute to that given by the PSC will not satisfy [SBC's] burden of proving the PSC's interpretation was unlawful or unreasonable."[6] However, the panel was concerned that a portion of the PSC order implementing its interpretation was "ambiguous" and remanded for clarification. Specifically, the panel and SBC were concerned that the order required SBC to enter each consumer's home to verify that the problem originated inside the house. This Court denied SBC's interlocutory application for leave to appeal.[7]

On remand, the PSC clarified its order by noting that "SBC need not enter a customer's premises *every* time that SBC is called upon to make a service trip";[8] however, SBC may not charge for services "if those services are reasonably necessary to diagnose problems attributable to its own facilities or exclude those facilities as a possible cause of service disruptions."[9]

In a published opinion, the Court of Appeals affirmed in part and remanded to require the PSC to issue a modified order.[10] In doing so, the panel relied on

---

[6] *Id*. at 3.

[7] *Ameritech Michigan v Pub Service Comm*, 472 Mich 890 (2005).

[8] Order of the PSC, August 1, 2005 (Case No. U-13079), p 4 (emphasis in original).

[9] *Id*.

[10] *In re Complaint of Rovas Against Ameritech Michigan*, 276 Mich App 55; 740 NW2d 523 (2007).

5

federal law and held that "inside wiring services" (services for problems with the wiring inside the customer's home) were not subject to regulation by the PSC because such problems are not within the PSC's authority. Thus, the panel held that the PSC could not regulate "correct determination[s] by SBC excluding its facilities as the cause of service disruption" because a correct determination that the problem originated inside the customer's home necessarily involves "inside wiring." [11] Both the PSC and SBC have appealed to this Court, and this Court granted both applications. [12]

## STANDARD OF REVIEW

As a general proposition, this Court reviews de novo questions of law, such as the proper interpretation of a statute. [13] However, the primary issue in this case is the proper standard of review of an administrative agency's construction of a statute. That standard of review is discussed below.

## ANALYSIS

This case implicates the powers, and the boundaries of the powers, of all three branches: the Legislature; the judiciary; and administrative agencies, which

---

[11] *Id.* at 60.

[12] *SBC Michigan v Pub Service Comm*, 480 Mich 977 (2007).

[13] *City of Taylor v Detroit Edison Co*, 475 Mich 109, 115; 715 NW2d 28 (2006).

are part of the executive branch.[14] Thus, separation of powers principles will aid in the analysis of the proper consideration due an administrative agency's interpretation of a statute.

The people of the state of Michigan have divided the powers of their government "into three branches: legislative, executive and judicial."[15] Furthermore, "[n]o person exercising the powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."[16]

"The legislative power of the State of Michigan is vested in a senate and a house of representatives."[17] Simply put, legislative power is the power to make laws.[18] In accordance with the constitution's separation of powers, this Court "cannot revise, amend, deconstruct, or ignore [the Legislature's] product and still be true to our responsibilities that give our branch only the judicial power."[19] While administrative agencies have what have been described as "quasi-

---

[14] *Straus v Governor*, 459 Mich 526, 535; 592 NW2d 53 (1999).

[15] Const 1963, art 3, § 2.

[16] *Id*.

[17] Const 1963, art 4, § 1.

[18] "It is the legislators who establish the statutory law because the legislative power is exclusively theirs." *Cameron v Auto Club Ins Ass'n*, 476 Mich 55, 65; 718 NW2d 784 (2006).

[19] *Id*. at 65-66.

legislative" powers, such as rulemaking authority, these agencies cannot exercise legislative power by creating law or changing the laws enacted by the Legislature.[20]

Since the time of *Marbury v Madison*,[21] interpreting the law has been one of the defining aspects of judicial power. "Although we may not usurp the lawmaking function of the legislature, the proper construction of a statute is a judicial function, and we are required to discover the legislative intent."[22] Administrative agencies exercise what have been described as "quasi-judicial" powers.[23] However, such power is limited and is not an exercise of constitutional "judicial power." The primary "judicial" function exercised by administrative agencies is confined to conducting contested cases, like the one at issue here. These administrative contested cases resemble trials. Constitutionally and statutorily, these administrative fact finding exercises are entitled to a degree of

---

[20] While rulemaking has legislative qualities, the power must be exercised pursuant to valid enabling legislation that does not improperly delegate "legislative" authority. *Taylor v Gate Pharmaceuticals*, 468 Mich 1, 10 n 9; 658 NW2d 127 (2003).

[21] 5 US (1 Cranch) 137; 2 L Ed 60 (1803).

[22] *Webster v Rotary Electric Steel Co*, 321 Mich 526, 531; 33 NW2d 69 (1948) (internal citations omitted). See also *Kelly v Secretary of State*, 293 Mich 530, 533; 292 NW 479 (1940) ("[I]n the final analysis the construction of a statute still remains in the judicial branch of our government.").

[23] Const 1963, art 6, § 28.

deference defined by statute and our constitution.[24] However, fact finding in an administrative contested case, much like in a trial before a circuit court, is a far different endeavor than construing a statute.

## I. REVIEW OF AN ADMINISTRATIVE AGENCY'S INTERPRETATION OF A STATUTE

With these separation of powers principles in mind, we now turn to the proper standard, under Michigan law, for reviewing an agency's construction of a statute.

## A. MICHIGAN JURISPRUDENCE

Unlike the United States Constitution, the Michigan Constitution specifically recognizes administrative agencies. Furthermore, the constitution explicitly provides for judicial review of administrative decisions:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. Findings of fact in workmen's compensation proceedings shall be conclusive in the absence of fraud unless otherwise provided by law.
>
> In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final

---

[24] Const 1963, art 6, § 28. See also MCL 462.26(8).

agency provided for the administration of property tax laws from any decision relating to valuation or allocation.[25]

The constitutional provision provides for review to determine: (1) that the decision is authorized by law, and (2) if a hearing is required, that the decision is supported by record evidence.[26] However, the provision does not stand for the proposition that agencies can assume this Court's constitutional role as the final arbiter of the meaning of a statute.

Before evaluating the standard of review applicable to an agency's interpretation of a statute, it is helpful to delineate the agency functions not at issue in this case. This distinction is important because there are different standards of review for different agency functions. As noted earlier, agencies perform both "quasi-legislative" and "quasi-judicial" functions. First, there is the rulemaking function. A reviewing court must determine whether the Legislature,

---

[25] Const 1963, art 6, § 28.

[26] The constitutional convention that drafted our constitution explained the purpose of this provision in its "Address to the People":

> This is a new section recognizing the increased significance assumed by administrative law in the legal system of the state in recent years. It provides that decisions, findings, rulings and orders of administrative officers or agencies which affect private rights be subject to judicial review.

> Excepted in the section are findings of fact in workmen's compensation proceedings. These findings would be conclusive in the absence of fraud, unless otherwise provided by law. Also excepted are appeals of certain decision of agencies dealing with administration of property tax laws. [2 Official Record, Constitutional Convention 1961, p 3389.]

in accordance with the separation of powers principles discussed, properly delegated authority to the agency to promulgate the rule at issue.[27] That question concerns the constitutionality of the statute, a legal issue that this Court reviews de novo.[28] If the Legislature has properly delegated the rulemaking authority, then the only question before the court is whether the agency "has exceeded its authority granted by the statute."[29]

The other agency function not at issue in this case is fact finding in contested cases. The constitution requires that such agency findings be "supported by competent, material and substantial evidence on the whole record."[30] Review of an administrative agency's fact finding is akin to an appellate court's review of a trial court's findings of fact in that an agency's findings of fact are entitled to deference by a reviewing court. In its fact finding capacity, the agency has reviewed evidence, such as witness testimony, and it is in the best position to evaluate the credibility and weight of that evidence. Similar to the clear error standard of review for circuit courts, under the constitutional and statutory standards of review, a reviewing court must ensure that the finding is supported by record evidence; however, the reviewing court does not conduct a new evidentiary

[27] *Gate Pharmaceuticals*, *supra* at 10 n 9.

[28] *Id*. at 5.

[29] *Dep't of Natural Resources v Seaman*, 396 Mich 299, 314; 240 NW2d 206 (1976).

[30] Const 1963, art 6, § 28.

hearing and reach its own factual conclusions, nor does the reviewing court subject the evidence to review de novo.[31]

Keeping these other administrative functions distinct from review of an agency's interpretation of a statute during a contested case is very important to ensure that the appellate court applies the proper standard of review. A review of our own cases suggests that when courts are unmindful of these differing functions, they also tend to muddle the distinct standards of review that apply to each. This Court has uniformly held that statutory interpretation is a question of law that this Court reviews de novo.[32] Thus, concepts such as "abuse of discretion" or "clear error," which are similar to the standards of review applicable to other agency functions, simply do not apply to a court's review of an agency's construction of a statute.

Nonetheless, the Court of Appeals panel in this case did not apply a de novo standard of review when assessing the PSC's interpretation of MCL 484.2502(1)(a). While there are some opinions that seem to stand for the proposition that agency statutory interpretations are reviewed for "reasonableness"

---

[31] *Viculin v Dep't of Civil Service*, 386 Mich 375, 392; 192 NW2d 449 (1971).

[32] See, e.g., *Kaiser v Allen*, 480 Mich 31, 35; 746 NW2d 92 (2008); *Brown v Detroit Mayor*, 478 Mich 589, 593; 734 NW2d 514 (2007); *Coblentz v Novi*, 475 Mich 558, 567; 719 NW2d 73 (2006); *City of Taylor*, *supra* at 115; and *In re MCI Telecom Complaint*, 460 Mich 396, 413; 596 NW2d 164 (1999).

or an "abuse of discretion,"[33] those standards do not apply to the interpretation of a statute, and they threaten the separation of powers principles discussed earlier by allowing the agency to usurp the judiciary's constitutional authority to construe the law and infringe on the Legislature's lawmaking authority.

However, "[w]e acknowledge that our past case law has not been entirely consistent regarding the subject of the amount of deference to be given when an administrative agency with expertise in its field construes a statute governing the area regulated by the agency."[34]  We believe that this is due in large part to the Court's failure consistently to use the same articulation of the proper standard of review for an agency's interpretation of a statute and to carefully apply the correct standards of review for different types of agency action.

This Court announced the proper standard of review for agency statutory construction more than 70 years ago in *Boyer-Campbell v Fry*,[35] which dealt with the proper construction of the General Sales Tax Act.  The *Boyer-Campbell* Court held that

> the construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons.  However, these are not binding on the courts, and [w]hile not controlling, the

---

[33] See *Champions Auto Ferry, Inc v Pub Service Comm*, 231 Mich App 699, 707-708; 588 NW2d 153 (1998); In re *MCI Telecom Complaint*, *supra* at 427.

[34] *In re MCI Telecom Complaint*, *supra* at 424 n 4.

[35] 271 Mich 282; 260 NW 165 (1935).

practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature.[36]

This standard requires "respectful consideration" and "cogent reasons" for overruling an agency's interpretation. Furthermore, when the law is "doubtful or obscure," the agency's interpretation is an aid for discerning the Legislature's intent. However, the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue.

*Boyer-Campbell* remains good law, and it has been used repeatedly by this Court.[37] However, in some of our later cases, this Court and the Court of Appeals have employed recitations of standards that do not follow the language of *Boyer-Campbell* or apply to review of agency's statutory construction. While these recitations do not necessarily substantively conflict with *Boyer-Campbell*, they

---

[36] *Id*. at 296-297 (internal citations and quotation marks omitted).

[37] See *Howard Pore, Inc v State Comm'r of Revenue*, 322 Mich 49, 66; 33 NW2d 657 (1948); *Gen Motors Corp v Erves*, 395 Mich 604, 621; 236 NW2d 432 (1975) (Coleman, J.) ("It is the responsibility of the judiciary to interpret legislative intent and this responsibility cannot be delegated. We agree with the Court of Appeals that consideration should be afforded to the [agency] interpretation of this section. We cannot abdicate our ultimate responsibility."); *Id*. at 639-640 (Williams, J.).

14

add to the confusion discussed earlier.[38]  For example, in *Ludington Service Corp v Acting Comm'r of Ins*, this Court affirmed the Court of Appeals decision to overturn one portion of the agency's decision because the agency relied on an interpretation of a statute that conflicted with the statute's plain meaning.[39]  First, the Court reversed a number of the agency's factual determinations because they were not supported by "competent, material, and substantial evidence."[40]  The Court then turned to the statutory interpretation question and used the following standard of review in reaching that conclusion:

> Finally, while this Court affords deference to an agency's findings of fact, we can always review an agency's legal findings. Both the Michigan Constitution and the applicable statute permit this Court to set aside the commissioner's findings if they are in violation of the constitution or a statute, or affected by other substantial and material error of law.[41]

---

[38] Justice Kelly cites this statement for the conclusion that this opinion does not accomplish anything other than assign a specific name to the standard of review.  However, as discussed later in this opinion, some lower courts, such as the panel in this case, have relied on one of these varying standards to give nearly unfettered deference to an agency's interpretation of a statute.  The definitions cited by Justice Kelly show how such an error could occur.  For instance, the first definition of "deference" is "respectful *yielding* to the opinion . . . of another . . . ." *Post* at 5 n 9 (emphasis added).  "Yielding" provides much more weight to an agency's interpretation than the "respectful consideration" to which such interpretations are entitled.

[39] 444 Mich 481, 497-498 and 498 n 23; 511 NW2d 661 (1994) (emphasis added).

[40] *Id*. at 493-494, 496-497, and 503.

[41] *Id*. at 503 (quotation marks omitted).

15

To that end, the Court held that "although this Court affords an agency some statutory deference, the agency's interpretation is not binding on this Court, and cannot be used to overcome the statute's plain meaning."[42] This standard does not directly conflict with *Boyer-Campbell* because the plain meaning of the statute still controlled the outcome; however, by referring to "deference" with regard to both the agency's fact finding and its statutory interpretation, the Court sowed the seeds of confusion.

Another example of a confusing articulation of the standard is illustrated in *Adrian School Dist v Michigan Pub School Employee Retirement Sys*,[43] where this Court held that "[t]he agency must interpret the statute it administers, and its interpretations are entitled to great weight." The case cited for this proposition, *Magreta v Ambassador Steel Co*,[44] did not actually use the words "great weight," but, rather, quoted the general *Boyer-Campbell* standard discussed earlier. While the *Adrian School Dist* Court independently construed the statute, by employing a term such as "great weight," this Court again allowed for the possibility that the judiciary must defer to the agency's interpretation of the statute.

---

[42] *Id*. at 505 (quotation marks and emphasis omitted).

[43] 458 Mich 326, 336; 582 NW2d 767 (1998).

[44] 380 Mich 513, 519; 158 NW2d 473 (1968).

16

A similar blurring of standards occurred in *Catalina Marketing Sales Corp v Dep't of Treasury*,[45] in which this Court held that, while it "affords deference to the construction of statutory provisions by any particular department of the government and used for a long period, the department's interpretation is not binding on this Court and cannot be used to overcome the statute's plain meaning . . . ." *Catalina* adds the concept of deference to longstanding agency interpretations to the general deference referenced in *Ludington*.[46] Like *Ludington*, *Catalina* recognizes the fundamental requirement that the statute's plain meaning controls.[47] Furthermore, the Court rejected the agency's interpretation because it conflicted with the plain meaning.

Because this Court's decisions that used imprecise language still made clear that the plain language of the statute was the controlling legal consideration, the varying deference standards articulated in them seem to have had negligible

---

[45] 470 Mich 13, 23-24; 678 NW2d 619 (2004) (internal quotation marks omitted).

[46] This case does not concern a longstanding interpretation of a statute. Thus, this aspect of *Catalina* is not before the Court. We note that the Court's reluctance to overrule longstanding agency interpretations may stem from the prudential concerns, such as reliance interests, discussed in *Robinson v Detroit*, 462 Mich 439, 463-468; 613 NW2d 307 (2000), with regard to the doctrine of *stare decisis*. However, we reserve decision on this issue until we are presented with a case that requires consideration of a longstanding agency interpretation in which reliance issues are at stake.

[47] See also *Czymbor's Timber, Inc v Saginaw*, 478 Mich 348, 356; 733 NW2d 1 (2007) ("[W]hile the DNR's interpretation of the statute is given some measure of deference, its construction cannot conflict with the plain language of the statute . . . .").

outcome determinative effect. However, by employing words such as "deference," which can imply that the judiciary must accede to the agency's interpretation of a statute, this Court has unmistakably added to the confusion in this area of the law. [48]

Given this Court's difficulty to hew to the correct standard it set forth in *Boyer-Campbell*, the Court of Appeals has understandably relied on some of the confusing articulations of standards made by this Court and thereby used the erroneous "deference" or "great weight" standard to allow agencies improperly to assume the courts' role as the final arbiter of a statute's meaning. For instance, the Court of Appeals panel in this case quoted *In re Michigan Cable Telecom Ass'n Complaint*[49] for the proposition that

> [a]s a general rule, we will *defer* to the construction placed on a statute by the governmental agency charged with interpreting it, unless the agency interpretation is *clearly erroneous*. An agency's initial interpretation of new legislation is not entitled to the same measure of *deference* as is a longstanding interpretation. However, merely establishing that another interpretation of a statute is plausible does not satisfy a party's burden of proving by *clear and convincing* evidence that the PSC's interpretation is *unlawful* or unreasonable.

---

[48] The order granting leave to appeal in *this* case is also an example of this confusion because we asked the parties to address "whether the commission *abused its discretion* in applying this statutory provision to a carrier's diagnostic mistakes." *SBC Michigan v Pub Service Comm*, 480 Mich 977 (emphasis added).

[49] 239 Mich App 686, 690; 609 NW2d 854 (2000) (emphasis added).

This hybrid "standard of review" is a prime example of the mixing and matching of the standards of review applicable to the different functions of an agency. Relying on this muddled and unduly deferential "standard," the panel acceded to an agency interpretation that the panel believed to be contrary to the plain meaning of the statute. When considering an agency's statutory construction, the primary question presented is whether the interpretation is consistent with or contrary to the plain language of the statute. While a court must consider an agency's interpretation, the court's ultimate concern is a proper construction of the plain language of the statute.

By using a deferential standard inconsistent with *Boyer-Campbell*, the panel below abdicated its judicial authority to construe statutes. By acceding to the agency's interpretation, the panel gave greater consideration to the agency's interpretation than it would have given a circuit judge's construction. Given that statutory construction is the domain of the judiciary, it is hard to imagine why a different branch's interpretation would be entitled to more weight than a lower court's interpretation. As established in *Boyer-Campbell*, the agency's interpretation is entitled to respectful consideration and, if persuasive, should not be overruled without cogent reasons. Furthermore, the agency's interpretation can be particularly helpful for "doubtful or obscure" provisions. But, in the end, the agency's interpretation cannot conflict with the plain meaning of the statute.

"Respectful consideration" is not equivalent to any normative understanding of "deference" as the latter term is commonly used in appellate

19

decisions. To avoid further confusion, courts should rely on the *Boyer-Campbell* articulation of the standard of review for an agency's interpretation of a statute instead of more recent cases, which have erroneously introduced inappropriate concepts such as "deference." Furthermore, courts should carefully separate the different agency functions under consideration and apply the proper standard of review for each.

## B. A NOTE ON THE FEDERAL *CHEVRON*[50] DEFERENCE DOCTRINE

Some have urged that this Court adopt the *Chevron* deference doctrine, which federal courts use to review agency interpretations.[51] The *Chevron* test requires the court to make two inquiries. First, the court must consider "whether Congress has directly spoken to the precise question at issue."[52] This inquiry may be dispositive because "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[53] The separation of powers principles discussed above provide the basis for this inquiry and result because "[t]he judiciary is the

---

[50] *Chevron USA Inc v Natural Resources Defense Council, Inc*, 467 US 837; 104 S Ct 2778; 81 L Ed 2d 694 (1984).

[51] However, there are other standards that may apply in certain circumstances. See *Skidmore v Swift & Co*, 323 US 134; 65 S Ct 161; 89 L Ed 124 (1944), and *Auer v Robbins*, 519 US 452, 461-463; 117 S Ct 905; 137 L Ed 2d 79 (1997).

[52] *Chevron*, *supra* at 842.

[53] *Id*. at 842-843.

final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."[54]

However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[55] The *Chevron* test for the permissibility of the agency's construction differs slightly depending on whether Congress explicitly or implicitly delegated authority to the agency "to fill any gap" left by Congress. "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."[56] An explicit delegation largely refers to the authority bestowed by Congress upon agencies to promulgate rules to enforce a statute.[57]

---

[54] *Id*. at 843 n 9.

[55] *Id*. at 843.

[56] *Id*. at 843-844.

[57] See *United States v Morton*, 467 US 822, 834; 104 S Ct 2769; 81 L Ed 2d 680 (1984) ("Congress authorized the promulgation of 'regulations for the implementation of the provisions of section 659,' 42 U.S.C. § 661(a)."); *Schweiker v Gray Panthers*, 453 US 34, 43; 101 S Ct 2633; 69 L Ed 2d 460 (1981) ("Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the Act."); and *Batterton v Francis*, 432 US 416, 425; 97 S Ct 2399; 53 L Ed 2d 448 (1977) ("Congress in § 407(a) expressly *delegated* to the Secretary the power to prescribe standards for determining what constitutes "unemployment" for purposes of [Aid to Families with Dependent Children-Unemployed Fathers] eligibility.").

21

On the other hand, an implicit delegation arises when the legislation does not address a specific factual situation or where the statute is ambiguous.[58]

If Congress has given the agency an explicit delegation, then the "regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."[59] When the delegation is implicit, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."[60] To that end, the Supreme Court has "recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."[61]

---

[58] See *Immigation & Naturalization Service v Jong Ha Wang*, 450 US 139, 144; 101 S Ct 1027; 67 L Ed 2d 123 (1981) ("The crucial question in this case is what constitutes 'extreme hardship.' These words are not self-explanatory, and reasonable men could easily differ as to their construction."), and *Train v Natural Resources Defense Council, Inc*, 421 US 60, 87; 95 S Ct 1470; 43 L Ed 2d 731 (1975) ("We therefore conclude that the Agency's interpretation of §§ 110(a)(3) and 110(f) was 'correct,' to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this is the 'correct' one.").

[59] *Chevron*, *supra* at 844.

[60] *Id*.

[61] *Id*.

While the *Chevron* inquiries are comparatively simple to describe, they have proven very difficult to apply.[62] This Court has never adopted *Chevron* for review of state administrative agencies' statutory interpretations, and we decline to adopt it now.[63] The vagaries of *Chevron* jurisprudence do not provide a clear road map for courts in this state to apply when reviewing administrative decisions. Moreover, the unyielding deference to agency statutory construction required by *Chevron* conflicts with this state's administrative law jurisprudence and with the separation of powers principles discussed above by compelling delegation of the judiciary's constitutional authority to construe statutes to another branch of government. For these reasons, we decline to import the federal regime into Michigan's jurisprudence.

## II. PROPER INTERPRETATION OF MCL 484.2502(1)(a)

Having determined that agencies' constructions of statutes are entitled to respectful consideration, but are not binding on courts and cannot conflict with the plain language of the statute, we now turn to review § 2502(1)(a), which provides:

> (1) A provider of a telecommunication service shall not do any of the following:

---

[62] Andersen, *Against Chevron – a modest proposal*, 56 Admin L R 957, 960 (2004) (footnotes omitted) ("The confusions extend to very basic questions, such as when the doctrine applies, how to distinguish its two steps from each other, and how to distinguish the test from other commonly used tests of agency action.").

[63] However, this Court has approvingly cited *Chevron* in the past. See, e.g., *Empire Iron Mining Partnership v Orhanen*, 455 Mich 410, 416; 565 NW2d 844 (1997).

(a) Make a statement or representation, including the omission of material information, regarding the rates, terms, or conditions of providing a telecommunication service that is false, misleading, or deceptive.

The critical question here was the meaning of "false" and, thus, whether this statute penalized merely factually inaccurate statements, as the PSC concluded, or whether "false" includes a requirement that the inaccuracy be intentionally communicated. Importantly, the PSC did not actually provide an analysis for its "construction" of the statutory language. In its February 25, 2002, order, the PSC discussed the parties' arguments concerning this section. The hearing referee had found that the "inaccuracies" at issue stemmed from the difficulties inherent in diagnosing the problem experienced by the SBC customers. SBC argued that the "misdiagnosis" in this case was not the type of activity proscribed by the statute and the hearing referee agreed. The customers and the PSC staff contrarily argued that any *untrue* statement was subject to the statutory sanctions. The PSC agreed with the customers and the PSC staff, rejecting the hearing referee's application of the statute. In reaching that conclusion, the PSC first discussed three facts: (1) when the customers reported the problem, SBC's automated system informed them that they would only be charged for problems with inside wiring; (2) the technician, without entering the customers' house, informed the customers that the problem was inside and that the customers owed $71; and (3) the customers received an invoice for $71 from SBC's automated billing process, even though SBC had determined that the problem was with the

24

outside wiring. The PSC then concluded that, "[b]ased on these facts, the company's statements to [the customers] on April 3 and 4, 2001 were false," and therefore, SBC violated § 2502(1)(a). However, the PSC did not conclude that the false statements were intended to deceive.[64]

In reaching this conclusion, the PSC did not analyze the language of the statute, nor did it provide a rationale for its unexplained conclusion that the statutory term "false" meant "untrue" or "incorrect." The PSC's bald assertion that SBC violated the statute is not a "construction" of the statute. Therefore, under the *Boyer-Campbell* standard, there is little here for any reviewing court to "respectfully consider." The PSC, having failed to offer a construction of its own that would warrant any consideration, requires that we provide, as the panel below should have provided, an interpretation of the plain language of the statute.

The Court of Appeals acknowledged that "false" has multiple meanings, and the panel listed the following definitions:

> "1. not true or correct; erroneous; wrong: *a false statement.*
> 2. uttering or declaring what is untrue; lying: *a false witness.* 3. not
> faithful or loyal; treacherous; hypocritical: *a false friend.* 4. tending
> to deceive or mislead; deceptive: *a false impression . . . .*"[65]

---

[64] Justice Kelly is correct that the PSC held that this was not a case of "simple misdiagnosis." However, the PSC did not rule, as Justice Kelly would, that "[t]hese statements were made with at least a reckless disregard of their truth or falsity." *Post* at 9.

[65] *SBC Michigan, supra* at 2, quoting *Random House Webster's College Dictionary* (1997), p 469.

25

The panel indicated that it favored the "tending to deceive or mislead" fourth definition because of the statutory context. Furthermore, the panel stated that it found insufficient evidence in the record to support an intent by SBC to mislead its customers. However, relying on an erroneous standard of review, the panel upheld the decision of the PSC because the agency's interpretation "was quite literal and certainly not unlawful or unreasonable."

By ignoring the statutory context, the PSC's implicit interpretation of "false" was erroneous. "As a general matter, words and clauses will not be divorced from those which precede and those which follow. When construing a series of terms . . . we are guided by the principle that words grouped in a list should be given related meaning."[66] In other words, this Court applies the doctrine of *noscitur a sociis*, which "stands for the principle that a word or phrase is given meaning by its context of setting."[67]

The statute prohibits telecommunications providers from making "a statement or representation . . . that is false, misleading, or deceptive."[68] The context of the word "false" is the key to determining which of the multiple definitions of that term the Legislature intended, and the other related statutory

---

[66] *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 533; 697 NW2d 895 (2005) (internal citations and quotation marks omitted).

[67] *Koontz v Ameritech Services, Inc*, 466 Mich 304, 318; 645 NW2d 34 (2002) (citations and quotation marks omitted).

[68] MCL 484.2502(1)(a).

terms—"misleading" and "deceptive"—provide that context. "Mislead" means "1. to lead or guide in the wrong direction. 2. to lead into error of conduct, thought, or judgment; lead astray,"[69] and "deceive" means "to mislead by a false appearance or statement; trick."[70] Thus, both "mislead" and "deceive" require the perpetrator intentionally to trick or lead astray his or her victim. These definitions provide insight into which "related meaning" of "false" the Legislature intended. The definition of "false" that has a related meaning to the other descriptive statutory terms is the fourth definition cited by the Court of Appeals: "tending to deceive or mislead; deceptive." Thus, a mere mistaken communication would be insufficient to make a "false" statement penalized under this statute. The fact that the SBC's technician's statement was simply "untrue" or that a bill mistakenly sent in reliance on the technician's incorrect diagnosis constitute insufficient proof to establish falsity required by the statute.[71]

---

[69] *Random House Webster's College Dictionary* (1997). "Misleading" simply means "tending to mislead; deceptive." *Id*.

[70] *Id*. The statutory word "deceptive" means "likely to deceive; capable of deception." *Id*.

[71] In its brief, the PSC suggests that § 2502(1)(a) is a strict liability provision. To support its position, the PSC points to MCL 484.2506(3), which provides for a "*bona fide* error" exception to MCL 484.2505 and 484.2507, and reasons that the lack of such an exception in § 2502(1)(a) means that the Legislature intended to punish mere mistakes under that section. MCL 484.2505(1) provides that "[a]n end user of a telecommunications provider shall not be switched to another provider without the authorization of the end user." MCL 484.2507(1) provides that "[a] telecommunications provider shall not include or add optional services in an end-user's telecommunications service

(continued…)

27

Thus, we conclude that only statements that are *intentionally* false qualify as violations of the statute, and the Court of Appeals statutory construction determination and the PSC's conclusion that a statutory violation occurred must be reversed.

## III. THE PROPRIETY OF THE COURT OF APPEALS REMAND ORDER

In its first opinion, the Court of Appeals held that the remedy provision of the PSC's February 25, 2002, order was ambiguous and remanded for clarification. The Court was unsure whether the PSC required SBC to enter each customer's home to verify that the problem stemmed from wiring inside the customer's home. On remand, the PSC ruled:

> The Commission should clarify the discussion section of its February 25, 2002 order to indicate that SBC need not enter a customer's premises *every* time that SBC is called upon to make a service trip, but that it may not impose charges to recover the cost of services it provides to inspect, diagnose, and repair malfunctions covered by its tariff obligation, including the cost of conducting routine physical checks of its own facilities, in response to complaints or inquiries, if those services are reasonably necessary to diagnose problems attributable to its own facilities or exclude those facilities as a possible cause of service disruptions.[72]

---

(…continued)
package without the express oral or written authorization of the end-user." The problem with the PSC's analysis is that, as discussed above, the plain language of § 2502(1)(a) does not prohibit mere mistakes or "bona fide errors." Therefore, it would be unnecessary for the Legislature to provide such an exception to § 2502(1)(a).

[72] Order of the PSC, August 1, 2005 (Case No. U-13079), p 4 (emphasis in original).

28

In its second opinion, the Court of Appeals cited federal authority[73] for the proposition that states were generally precluded from regulating services provided by telephone companies for "inside wiring." However, states are free to regulate the telephone companies' networks or "outside wiring." On the basis of these principles, the panel took issue with the portion of the order directing "SBC not to impose charges for services that 'exclude [SBC's] facilities as a possible cause of service disruptions.'"[74] The Court held that this sentence violated the federal regulations because "a correct determination by SBC excluding its facilities as the cause of service disruption inherently constitutes a correct determination that the disruption was caused by the customer's inside wiring."[75] The panel remanded to the PSC to remove any regulation of "inside wiring," including fees attributable to *correct* determinations that the problem originated with the customer's inside wiring.

The parties agree that SBC cannot charge for services performed for "outside wires" and that the PSC cannot regulate services on "inside wiring." The issue is whether the PSC's August 1, 2005, order is a permissible regulation of "outside wires" or an impermissible regulation of "inside wires." We agree with

---

[73] *In re Rovas Complaint*, *supra* at 59, citing Detariffing the Installation & Maintenance of Inside Wiring, 51 Fed Reg 8,498, 8,499 (March 12, 1986), & In re Detariffing the Installation and Maintenance of Inside Wiring, 7 FCC Rec 1,334, 1,339 (November 21, 1991).

[74] *In re Rovas Complaint*, *supra* at 60.

[75] *Id.*

the Court of Appeals that, to the extent the order prohibits SBC from charging for services associated with a problem caused by inside wiring, it is improper. While SBC may have to inspect its outside wires to confirm that a problem is with the customer's inside wiring, the fact remains that if the problem is with the inside wiring, then SBC had to make a service call for an inside wiring problem. The PSC cannot regulate that service and must amend its order to eliminate that improper regulation.

## CONCLUSION

With today's decision, we reaffirm the *Boyer-Campbell* standard of review, which provides a longstanding and clear standard for appellate courts to apply to an administrative agency's interpretation of a statute. In accordance with separation of powers principles and this Court's older cases, we hold that agency interpretations are entitled to respectful consideration, but they are not binding on courts and cannot conflict with the plain meaning of the statute. While the agency's interpretation may be helpful in ascertaining the legislative intent, courts may not abdicate to administrative agencies the constitutional responsibility to construe statutes. Giving uncritical deference to an administrative agency would be such an improper abdication of duty.

Applying the proper standard to the statute at issue in this case, the PSC's interpretation is erroneous, as was the panel's undue deference to that construction. The Court of Appeals alternative interpretation (which it did not adopt) represents the proper interpretation of this statute. Under the appropriate

30

interpretation of the statute, merely incorrect statements made with no intent to deceive are not subject to sanctions. Additionally, the PSC must modify its order to incorporate a correct construction of the statute and eliminate any regulation of inside wiring.

<div style="margin-left: 50%;">
Robert P. Young, Jr.
Clifford W. Taylor
Maura D. Corrigan
Stephen J. Markman
</div>

In re COMPLAINT OF ROVAS AGAINST
SBC MICHIGAN

_____

SBC MICHIGAN,

       Plaintiff-Appellant,

v                                                                                    No. 134493

PUBLIC SERVICE COMMISSION,

       Defendant-Appellee.

_____

SBC MICHIGAN,

       Plaintiff-Appellee,

v                                                                                    No. 134500

PUBLIC SERVICE COMMISSION,

       Defendant-Appellant.

_____

KELLY, J. (*concurring in part and dissenting in part*).

I concur in Part III of the majority opinion, which upholds the propriety of

the remand order of the second Court of Appeals panel.  I dissent from the rest of

the majority opinion because it is founded on a misunderstanding of the decision

of the Public Service Commission (PSC).

The majority holds that, in Michigan, an agency's construction of a statute

is entitled to "respectful consideration" and "should not be overruled without

cogent reasons."[1]  This standard of review, according to the majority, is different from giving agency interpretations of statutes deference or great weight.  I see no meaningful distinction between the various names the Court has given to the proper standard of review over the years.  However, I see a noticeable lowering of the standard in the majority's actual application of it in this case.

The majority overturns the PSC's decision for no cogent reason.  The agency's decision was not based on the erroneous statutory construction that the majority attributes to it.  This case risks sending the unfortunate message that, from now on, reviewing courts need not afford agency decisions any careful consideration at all.  I cannot join the majority in sending this message.

I would uphold the PSC's decision because it correctly applied MCL 484.2502(1)(a) [2] to prohibit statements made with reckless disregard of their truth or falsity or with knowledge of their falsity.  It comports with the meaning of the statute.  Consequently, it is entitled to great weight, deference, or the most

---

[1] *Ante* at 19.

[2] The Michigan Telecommunications Act (MTA), MCL 484.2101 *et seq.,* states at MCL 484.2502:

(1) A provider of a telecommunication service shall not do any of the following:

(a) Make a statement or representation, including the omission of material information, regarding the rates, terms, or conditions of providing a telecommunication service that is false, misleading, or deceptive.

respectful consideration, regardless of the name this Court gives to the proper standard of review of an agency's statutory interpretation.

The record supports the PSC's conclusion. Ameritech Michigan, the predecessor of SBC Michigan, charged a $71 service fee for an inside wiring problem without ascertaining that the customers' loss of service originated inside the home. It billed the fee even after learning that the loss of service was due to a problem in its own network. The PSC correctly concluded that the service fee was predicated on false statements. The agency's conclusions, supported as they are by facts and law, should not be rejected.

## I. THE STANDARD OF REVIEW OF STATUTORY INTERPRETATIONS BY ADMINISTRATIVE AGENCIES

The majority borrows its conclusion that an agency's interpretation of a statute is entitled to "respectful consideration" from this Court's decision in *Boyer-Campbell Co v Fry*.[3] It suggests that this standard of review cannot exist by any other name. It specifically rejects other decisions of the Court in which the standard of review was to "defer" to agency interpretations, to accord them "great weight," or to review their "reasonableness."[4]

Yet, the Court in *Boyer-Campbell* used these very terms interchangeably. It said:

---

[3] *Boyer-Campbell Co v Fry*, 271 Mich 282; 260 NW 165 (1935).

[4] *Ante* at 13-19.

3

Legislative resolutions are not law, although they are entitled to *respectful consideration*, . . . and "the construction given to a statute by those charged with the duty of executing it is always entitled to *the most respectful consideration* and *ought not to be overruled without cogent reasons*." However, these are not binding on the courts, and [w]hile not controlling, the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given *weight* in construing such laws and is sometimes *deferred to when not in conflict with the indicated spirit and purpose of the legislature*."[5]

The Court concluded in *Boyer-Campbell* that the interpretation of the general sales tax act made by the state board of administration was "reasonable and sensible."[6]

*Boyer-Campbell* does not stand for the proposition that the standard of review of agency decisions should be known by one name only. Nor does the fact that, over the years, the Court has used various terms to denote the proper standard of review indicate that it has been inconsistently applied. As the majority acknowledges, regardless of the language used, "this Court's decisions . . . made clear that the plain language of the statute was the controlling legal consideration."[7] The actual name given to the standard of review has "negligible outcome-determinative effect,"[8] as long as the standard is properly applied.

---

[5] *Boyer-Campbell*, 271 Mich at 296-297 (emphasis added; internal citations omitted).

[6] *Id*. at 300.

[7] *Ante* at 17.

[8] *Ante* at 17-18.

There is nothing shocking about the Court deferring to an agency's interpretation of a statute that the agency administers and that falls within its particularized expertise. "Deference" is simply another name for respectful consideration.[9] Under a properly applied standard of review, an agency's statutory interpretation is entitled to deference when it comports with the Legislature's intent as expressed in the plain language of the statute. Of importance is not what the Court calls the standard of review, but how it applies it.

## II. THE PSC'S CONSTRUCTION OF MCL 484.2502(1)(a)

The majority purports to review the PSC's construction of MCL 484.2502(1)(a) de novo. As it acknowledges, the PSC never specifically interpreted the meaning of the phrase "false, misleading, or deceptive" in its decision.[10] But it did apply the statute to the facts of the case, as it is entitled to do

---

[9] *Random House Webster's College Dictionary* (2001) defines "deference" as "1. respectful yielding to the opinion . . . of another . . . . 2. respectful or courteous regard." The majority suggests that "yielding" to an agency interpretation of a statute has led to "nearly unfettered deference" by lower courts. *Ante* at 15 n 38. It is true that the first Court of Appeals panel in this case misunderstood the PSC's decision and deferred to it for the wrong reasons. However, when lower courts correctly construe an agency decision, as the second panel did, they should defer to the agency's interpretation of a statute that comports with the Legislature's intent. Were courts never to defer to agency interpretations, appeals from those interpretations would be encouraged in the hope that courts might be persuaded to ignore the interpretations entirely. That is precisely what happened in this case.

[10] *Ante* at 25.

5

in the case of an unambiguous statute.[11]  The meaning that the PSC accorded to the phrase "false, misleading, or deceptive" can be inferred indirectly from the legal conclusions it drew from the facts.

Although the majority recites the PSC's legal conclusions, it does not review them independently.  Rather, it relies on the review of them made by the first Court of Appeals panel, and, in so doing, it repeats that panel's mistakes.[12]  The majority reviews the decision of the first Court of Appeals panel de novo, but it does not directly review the decision of the PSC.

The first Court of Appeals panel concluded that the PSC understood "false" to mean "not true or correct" and, consequently, deemed a "false" statement to mean a simple mistake.[13]  In essence, the panel assumed that the PSC interpreted MCL 484.2502(1)(a) as imposing strict liability for any inaccurate statement, no matter how innocently made.  The majority adopts this erroneous interpretation of the agency's decision.[14]  It concludes that the PSC's statutory interpretation is

---

[11] "This Court has consistently held that when the statutory wording is unambiguous, it need only be applied." *Ludington Service Corp v Acting Comm'r of Ins*, 444 Mich 481, 497 n 22; 511 NW2d 661 (1994) (citations omitted).

[12] *Ante* at 25-26.

[13] *Ameritech Michigan v Pub Service Comm*, unpublished opinion per curiam of the Court of Appeals, issued June 17, 2004 (Docket No. 244742), p 2.

[14] *Ante* at 25.  On appeal, SBC argued for the same reading.  Surprisingly, the Attorney General's office, which represented the PSC before this Court, contended that MCL 484.2502(1)(a) imposes strict liability, reaching even

(continued…)

erroneous because, in the phrase "false, misleading, or deceptive," which is its proper context, the word "false" does not mean "untrue." The majority concludes that it means "*intentionally* false" or "intended to deceive."[15] It derives its interpretation of "false" from the dictionary definitions of the words "misleading" and "deceptive."[16]

But the majority's conclusion that the statute refers to untrue statements made with an intent to deceive falls short of the mark. This occurs because it collapses two distinct elements of "deceit" into the phrase "intent to deceive": (1) knowledge or reckless disregard of the falsity of a statement and (2) intent that the statement cause detrimental reliance.

"Deceit," also known as "false or fraudulent misrepresentation," is a legal term of art with a long history in the common law. Legal terms of art are generally accorded their established meaning in the law.[17] In addition, statutes are

(…continued)
innocent mistakes. The strict liability argument that it advanced in this Court was not made before the PSC.

[15] *Ante* at 25, 28.

[16] *Ante* at 27 and nn 69 & 70.

[17] "A legal term of art is a technical word or phrase that has acquired a particular and appropriate meaning in the law. It is, in a statute, to be construed and understood according to such meaning." *People v Law*, 459 Mich 419, 425 n 8; 591 NW2d 20 (1999), citing MCL 8.3a.

construed so as not to abolish by implication "well-settled common-law principles."[18]

Black's Law Dictionary defines "fraudulent misrepresentation" as "[a] false statement that is known to be false or is made recklessly—without knowing or caring whether it is true or false—and that is intended to induce a party to detrimentally rely on it."[19] In Michigan, fraudulent representation requires

> "(1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury."[20]

As these definitions make clear, the intent element of deceit consists of (1) knowledge of falsity or reckless disregard of the truth or falsity of a statement, and (2) an intent that a person detrimentally rely on the statement.

The PSC's decision shows that the agency *did* apply the statute according to the established rules for false representation. The PSC applied the statute to the following facts: (1) the customers were told that the $71 service fee would be applied only if the problem was caused by inside wiring, (2) without so much as entering the home, the technician left a tag stating that the problem was with the

---

[18] *Marquis v Hartford Accident & Indemnity* (*After Remand*), 444 Mich 638, 652; 513 NW2d 799 (1994).

[19] Black's Law Dictionary (7th ed).

[20] *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976), quoting *Candler v Heigho*, 208 Mich 115, 121; 175 NW 141 (1919).

8

inside wiring and the customers owed a $71 service fee, and (3) the customers subsequently received a $71 bill for the service call, even though, in the meantime, SBC had made several repairs to its own network that solved the customers' problem.

The PSC expressly stated that the $71 service fee did not result from a "simple misdiagnosis." Rather, it concluded that SBC's "propensity for assuming that the problem is with the inside wiring whenever a service technician finds a dial tone at the network interface, and for assessing the $71 charge without first verifying that the problem actually arises from within the customer's premises can lead to repeated violations of the MTA."

Because the PSC expressly declined to characterize the problem as a simple misdiagnosis, it is clear that it did not interpret the statute as imposing strict liability for simple mistakes. It deemed SBC's statements false because SBC initially imposed the $71 service fee without knowing that the problem the customers had complained of originated inside the customers' home. And it reimposed the fee after it ascertained that the problem was in its own network, not inside the home. These statements were made with at least a reckless disregard of their truth or falsity. They were made with an intent to cause the customers to pay the $71 service fee in reliance on SBC's representations that the problem originated inside the home. Thus, they were made with an intent to deceive.

Had the PSC expressly interpreted the statute, or had it stated its conclusions differently, it might have avoided the confusion its decision has

9

engendered. However, it cannot be seriously faulted for not specifically stating that it applied the statute according to the rules of deceit. Those rules are well established and clearly deducible from the agency's legal conclusion.

The agency concluded that SBC assumes that a problem arises inside a customer's home without sufficiently testing its own network and without verifying that the problem is inside the home. The underlying premise of this conclusion is that SBC charges the service fee regardless of its lack of knowledge of the true origin of the customer's loss of service. Such a charge is in reckless disregard of the truth or falsity of its assumption that the problem is inside the home.[21]

The Court misconstrues the agency's application of the statutory provision, and a misconstruction cannot constitute a "cogent reason" for overturning an agency's ruling.

### III. THE RECORD EVIDENCE SUPPORTING THE PSC'S DECISION

In light of the fact that the PSC applied the statute correctly, the question becomes whether its factual findings are "supported by competent, material and

---

[21] The majority acknowledges that the PSC held that this was not a case of "simple misdiagnosis," but it claims that the PSC never found that SBC charged the fee in reckless disregard of the truth or falsity of its assumption about the origin of the problem. *Ante* at 25 n 64. The majority fails to offer any other interpretation of the PSC's legal conclusions, which were based on SBC's inadequate diagnostic procedures rather than on the individual technician's misdiagnosis.

substantial evidence on the whole record."[22]  If supported by such evidence, they

are entitled to deference, as the majority concedes.[23]

The first Court of Appeals panel disagreed with the PSC's factual findings.

It believed that the service fee was based on a simple diagnostic error.[24]  The panel

was unclear what evidence supported the PSC's conclusion that the charging of a

service fee by SBC presented a systemic problem.[25]  By contrast, the second Court

of Appeals panel found substantial evidence supporting the PSC's conclusion.[26]

Indeed, substantial evidence on the whole record does support the

conclusion that SBC based its charge of the service fee on an assumption.  It

---

[22] Const 1963, art 6, § 28.

> What the drafters of the Constitution intended was a thorough judicial review of administrative decision, a review which considers the whole record—that is, both sides of the record—not just those portions of the record supporting the findings of the administrative agency. Although such a review does not attain the status of *de novo* review, it necessarily entails a degree of qualitative and quantitative evaluation of evidence considered by an agency.  Such review must be undertaken with considerable sensitivity in order that the courts accord due deference to administrative expertise and not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views. [*Michigan Employment Relations Comm v Detroit Symphony Orchestra, Inc*, 393 Mich 116, 124; 223 NW2d 283 (1974).]

[23] *Ante* at 11.

[24] *Ameritech Michigan*, *supra* at 2.

[25] *Id*. at 3.

[26] *In re Complaint of Rovas Against Ameritech Michigan*, 276 Mich App 55, 63; 740 NW2d 523 (2007).

11

assumed that, if its employee detected a dial tone at the network interface, the customer's problem was located inside the house. This assumption was in conscious disregard of the fact, well known by SBC, that there was a frequent problem of an intermittent signal transmitted by SBC's own facilities.

The complaining customer, William Rovas,[27] an engineer, presented the following evidence: He thoroughly checked his telephone line at the interface of his phone line and the SBC network line. He found that the line went dead after 8 to 15 minutes and diagnosed the problem as an intermittent dial tone. Rovas attempted to apprise SBC of his diagnosis during his initial service telephone call, but the SBC voice-mail system reduced his message to a cryptic "no dial tone."[28] Certain that the problem was in SBC's network, the technically sophisticated Rovas unplugged the telephone equipment inside his home to give the SBC technician a clear outside line.

The SBC technician who made the first service visit left a tag on the door of the Rovases' home. On the tag, he had marked a box that corresponded to the

---

[27] The complainants were William and Sandra Rovas, but only William Rovas testified at the hearing before the hearing referee.

[28] On the basis of evidence of SBC's repeated miscommunications with the customer, the agency also concluded that SBC violated administrative rules concerning system maintenance and service quality, Mich Admin Code R 484.31 and R 484.51(1)(c), which have since been rescinded. This part of the PSC's decision is not on appeal.

following preprinted text: "The outside lines were checked. The problem shows to the inside premises. A charge of $71 applies to today's visit."

Rovas was understandably baffled. First, his own testing had shown that the SBC network was sending an intermittent signal. Second, the tag did not indicate how the technician could have concluded that the problem was inside without entering the premises. Third, the tag did not identify what problem inside the premises the technician had actually diagnosed and whether that problem was the same one of which Rovas had complained.[29]

Rovas additionally complained that, although SBC eventually correctly diagnosed the problem as an intermittent dial tone and fixed its own network, the service fee still appeared on the monthly telephone bill. Rovas's evidence established that SBC charged the fee without ascertaining that the problem was inside the home, then billed Rovas for it, knowing that the problem was outside the home.

SBC offered several witnesses. Notably not among them was the technician who had left the tag and charged the service fee. The PSC staff placed a continuing objection to the speculative testimony of Tom Dunning, the dispatch

---

[29] The service tag message is misleading. It does not make clear whether checking the outside lines includes checking the inside phone wires at the network interface. Rather, it assumes that the problem is inside after a check of the outside lines found them working properly, although only momentarily. The fact that an outside line functions momentarily is not a reliable basis for charging the customer the nonregulated $71 service fee if an intermittent dial tone is a possible problem. The fee should be reserved for problems known to originate inside the home.

13

control manager. He testified that the technician must have followed SBC's procedures. He must have used an intelligent field device (IFD), Dunning stated, capable of checking both the inside and outside wiring at the network interface outside the Rovases' home. Dunning testified:

> If the technician went and tested at the network interface, found the . . . network was providing dial tone to the network interface, he would assume that the trouble, because he did have good dial tone, could have been in the customer's home.
>
> He would look in with his IFD. He would test it both ways. If there was a shorted out [sic], he would have obviously known that, but by looking inside, and he did not see any equipment on the inside, so he would bill the customer.

Dunning also testified that an intermittent dial tone was something the technicians dealt with on a daily basis. However, he did not identify any procedures that SBC followed to distinguish this common problem from a problem inside a home. Rather, according to his testimony, technicians were reprimanded only if they took no corrective action when they found no dial tone at the network interface.

The hearing referee and the first Court of Appeals panel agreed with SBC that the problem of an intermittent dial tone is difficult to diagnose or fix. They reasoned that the technician incorrectly diagnosed the problem because the telephone equipment inside the home had been unplugged. This view of the evidence is both incorrect and one-sided.

First, the hearing referee and the Court of Appeals gave the SBC technician the benefit of the doubt, assuming that he tested the inside wires even though the

14

service tag did not indicate it. Nor did the tag identify the problem that the technician diagnosed inside the home. I find it inappropriate to give SBC the benefit of the doubt under the circumstances. Because SBC asserted that the technician made an innocent mistake, it had the burden to prove that assertion. It also controlled its own witnesses. Yet, the technician was not called to testify about the basis for his diagnosis. Instead, SBC relied on Dunning's speculation that the disconnected equipment inside the home led to the service-fee charge.

Additionally, Dunning did not explain what justified the technician's assumption that the problem of which the customer had complained stemmed from the disconnected equipment inside the home. The lack of equipment inside may signal a number of things, including, in this case, that the customer intentionally disconnected his phone. Unlike a shorted wire, disconnected equipment does not necessarily qualify as a "problem" with inside wiring. The assumption that disconnected equipment is a malfunction inside the home may lead to repeated charges of a service fee although the malfunction is in the outside network. Such charges are all the more inappropriate when, as in this case, the customer has attempted to help SBC isolate the problem.

Lastly, both the hearing referee and the first Court of Appeals panel assumed that it was difficult to diagnose the Rovases' problem as an intermittent dial tone. SBC's witnesses testified that it was difficult to diagnose what causes an intermittent dial tone. Dunning explained that it may be caused by a weatherworn conductor somewhere on the outside line. Indeed, SBC never

15

identified the precise cause of the problem in this case and ultimately connected the Rovases to a new telephone line.

But because the cause of an intermittent dial tone is difficult to identify does not mean that it is difficult to identify the problem as an intermittent signal from SBC's network. In fact, when Rovas first called SBC, he had already concluded that the SBC network was sending an intermittent signal to his home. He attempted to relate his conclusion to SBC. Rovas's frustration with SBC was in large part due to the company's apparent incompetence in light of his correct original diagnosis.

No witness testified that SBC's technicians were trained to check whether a customer's problem was due to an intermittent signal in SBC's network. On the contrary, SBC's procedures allowed technicians to assume that an outside line was functional as long as it sent a signal at the moment of testing. SBC's procedures were clearly inadequate, considering that an intermittent dial tone is an everyday concern that requires more than a momentary testing of the outside line.

On the entire record before it, the agency was justified in its conclusion that SBC failed to establish that this was a case of a simple misdiagnosis. SBC's own procedures made it clear that its technicians were permitted to assume without further testing that an outside line was functional if it sent a signal when tested once. The technicians did not attempt to determine whether the customer's telephone equipment had been disconnected. The technicians charged a service fee after insufficient testing. The tag did not identify the problem that justified the

16

fee, nor did it match the technician's diagnosis with the problem of which the consumer complained.

If an intermittent dial tone occurs daily and SBC does not require its technicians to adequately test for it before charging a service fee, SBC recklessly ignores a known problem. Additionally, SBC neglects to take the improper service fee off the customer's telephone bill even after it knows that the complained-of problem is in its own network. The fee is refunded only if the customer complains.

As the PSC concluded, these company practices can lead to repeated violations of the MTA. SBC charges a service fee on the pretext that a complained-of problem is inside the customer's home. In that way, it imposes part of the cost of repair on the customer in cases of an intermittent dial tone caused by problems in the outside lines. SBC does so in violation of its duty to repair its own network without direct charge to its customers.

The PSC's decision is supported by competent, material, and substantial evidence on the whole record. Despite the first panel's faulty reasoning, both it and the second Court of Appeals panel correctly affirmed the decision.

IV. THE PSC'S ORDER

The PSC has now twice attempted to limit the circumstances under which SBC can charge its $71 service fee. The agency amended its original order to clarify that a technician is not always required to enter a customer's home in order to verify that the complained-of problem originates inside. The amended order

17

prohibits, among other things, the imposition of a fee for services needed to "exclude SBC's facilities as a possible cause of service disruptions." The second Court of Appeals panel took issue with this language and remanded the order to the PSC for additional modification to avoid the impression that the PSC impermissibly regulates inside wiring.[30]

I concur with the majority in affirming this part of the second Court of Appeals decision. I believe that the PSC's order needs to more accurately address the problem of SBC's knowing or reckless failure to test for an intermittent dial tone at the network interface.[31]

## V. CONCLUSION

The majority holds that a Michigan agency's interpretation of a statute that is within its area of expertise is not binding on the courts. Also, an agency interpretation cannot conflict with the plain meaning of the statute. There is nothing new or controversial about these holdings.

The majority also holds that an agency's interpretation of a statute entrusted to it is not entitled to "great weight" or "deference." It is instead entitled to

---

[30] *In re Complaint of Rovas*, 276 Mich App at 66.

[31] SBC argued before the agency that the service fee should be prohibited only if SBC determines that its network was the source of the malfunction. However, SBC cannot accurately determine the source until it changes its diagnostic procedures. SBC argued that it had improved its diagnostic technology and extensively trained its technicians. The PSC should consider whether these improvements ensure that SBC can correctly diagnose problems in its own network and does not charge customers for them prematurely.

"respectful consideration."  It is not clear what is distinct about this interpretative rule, and the majority neglects to explain the distinction.  It neglects also to explain how to apply its "new" rule.

Noteworthy is the fact that the majority also neglects to include in its rule certain crucial language from *Boyer-Campbell,* the opinion on which it relies.  In reciting the correct rule, *Boyd* mentions giving "most respectful consideration." But it does not stop there: it goes on to say that the construction accorded to a statute by an administrative agency charged with the duty of executing it "ought not to be overruled without cogent reasons."[32]  *Boyer-Campbell* then cites with approval another Michigan Supreme Court decision, *Owosso Bd of Ed v Goodrich.*[33]  *Owosso* states that courts are to give *weight* to the practical construction accorded to statutes by agencies and that agencies' interpretations should sometimes be *deferred to*.[34]

Hence, it is not clear what, if any, meaningful change the majority makes in the standard of review applicable to agencies' interpretations of statutes that they enforce.  What is important here is the majority's erroneous application of the standard of review.

---

[32] *Boyer-Campbell*, 271 Mich at 296 (quotation and citation omitted).

[33] *Owosso Bd of Ed v Goodrich,* 208 Mich 646, 652; 175 NW 1009 (1920).

[34] *Id.* (emphasis added).

I dissent from the majority's opinion because it overturns the PSC's decision on the ground that the PSC incorrectly construed the phrase "false, misleading, or deceptive" to impose strict liability for incorrect statements. The PSC did not impose strict liability. Rather, on the evidence before it, it correctly concluded that SBC assessed a service fee before it knew that the customers' problem was inside the home. It then billed the customers with knowledge that the problem was in the outside line. SBC's procedures indicated that the failure to test for intermittent dial tone at the network interface was a systemic problem rather than a one-time mishap.

I conclude that the first Court of Appeals panel reached the correct result even though the panel misinterpreted the agency's decision and deferred to the agency for the wrong reasons. I would affirm the decision of the second Court of Appeals panel in its entirety. The panel correctly deferred to the PSC after concluding that the agency's decision was supported by substantial evidence on the record. I would uphold the PSC's decision and would remand the case to the agency for clarification of its order. The limitations it imposed on SBC's ability to charge the $71 service fee concern only SBC's premature imposition of the fee based on insufficient testing for a commonly occurring problem.

Marilyn Kelly
Michael F. Cavanagh
Elizabeth A. Weaver

20