# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* VIJAY KUMAR, P.T.

---

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS,

UNPUBLISHED
May 8, 2018

Petitioner-Appellee,

v

Nos. 336712 and 341081
LARA Bureau of Professional
Licensing

VIJAY KUMAR, P.T.,

LC No.  15-047709

Respondent-Appellant.

---

Before:  SHAPIRO, P.J., and M. J. KELLY and O'BRIEN, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent, Vijay Kumar, P.T., appeals by right the final order and amended final order of the Michigan Board of Physical Therapy Disciplinary Subcommittee.  In Docket No. 336712, Kumar appeals the subcommittee's final order concluding that he violated MCL 333.16221(a) (negligence), MCL 333.16221(b)(*i*) (incompetence), and MCL 333.16221(b)(*vi*) (lack of good moral character) of the Public Health Code, MCL 333.1101 *et seq*., and suspending Kumar's license to practice physical therapy for a minimum of two years.  In Docket No. 341081, he appeals the subcommittee's amended final order, entered following a rehearing, reducing his suspension to a minimum of 18 months.  Because there are no errors warranting reversal, we affirm.

## I.  BASIC FACTS

This case began after Kumar was accused of sexually assaulting a 15-year-old patient, TC.  In July and August 2013, TC sought treatment from a physical therapy clinic in Rose City that was owned and operated by Kumar.  TC alleged that the first (and last) time she received

---

[1] *In re Kumar*, unpublished order of the Court of Appeals, entered November 28, 2017 (Docket Nos. 336712 and 341081).

-1-

treatment from Kumar, he touched her breasts twice. The first time, she was lying face down on "the table" and Kumar touched her breasts underneath her clothing. Then, when she was sitting in a chair, he began massaging her shoulders and eventually touched her breasts again underneath her clothing. TC said that Kumar then gave her $20 and told her not to tell anyone. She explained that she and Kumar then went to "the exercise room" and that Kumar took three pictures of her on his cellphone.

TC did not return to Kumar's clinic because she felt "uncomfortable." She said she told her mother, her grandmother, and three cousins of what had occurred. However, the matter was not reported to law enforcement until May 2014. Sergeant Peter McNamara, then a detective for the Michigan State Police, met with TC and attempted to set up a "pretext call" between TC and Kumar, whereby TC would initiate communications with Kumar on Facebook. TC made a "friend" request but Kumar did not immediately respond. However, eventually, Kumar and TC began communicating through "Facebook messenger."[2]

In June 2014, McNamara interviewed Kumar. McNamara indicated that when he asked Kumar if he inappropriately touched TC, Kumar merely repeated that he had "policies in place." McNamara obtained a search warrant for Kumar's phone, where he located a photograph of TC. He also reviewed the Facebook messages between Kumar and TC, and stated that he was concerned by the messages because he believed Kumar was "grooming" TC.

In July 2015, Kumar was charged with second-degree criminal sexual conduct (CSC-II). Petitioner then filed an administrative complaint against Kumar alleging violations of the Public Health Code. A summary order of suspension was entered, and petitioner filed a superseding administrative complaint, setting forth the events leading to the CSC-II charge as well as "Prior Incidents" of sexual misconduct involving Kumar's former patient, KS, and two former employees, JR and SM.

---

[2] In one Facebook message to TC, Kumar asked, "[D]id you get your glasses[?]" TC responded, "Yeah I got my glasses finally with the help from the 20 dollars you gave me that one day. Thank you for the money." In another message, Kumar asked TC to "come to see me when you get some time" and proposed that they could "meet right there in RC [Rose City]." Kumar also asked for TC for her "new number." TC asked Kumar if he "still [had] the pictures we took together of me on your phone" and asked him to send one picture. Kumar eventually sent the picture, which was taken on the last day TC had physical therapy, followed by "a smiley face with heart-shaped eyes," and a comment stating, "[I]sn't she gorgeous." TC informed Kumar that she has not started "drivers training" because "im really low on money," and Kumar answered, "[W]ell I can help you with that." TC then inquired why Kumar previously gave her money, specifically asking, in part, "But im just curious how come you handed me the money after when I let you felt [sic] my breast? I mean was it for not having me not to tell anyone because I didn't." Kumar responded that he gave TC money "to get the glasses."

At a September 2015 hearing held at Kumar's request to dissolve the summary suspension, KS testified that she was referred to Kumar for physical therapy in September 2002. The first two or three times KS visited his clinic, she received massage therapy from a physical therapist assistant. On her "last visit," Kumar performed the massage, which KS described as follows:

> He had me lay on the bed and lifted my shirt and undid my bra and started to do the massage therapy. And as he was doing the massage, I felt him kind of put his hand around my—the edge of my sides more, and I pulled my arms tight to my side. And he still kept putting his hands down further my sides.

KS clarified that when she said her "sides" she was referring to the sides of her breasts. KS said that she "just didn't feel comfortable with where he had been trying to massage, the way—where his fingers felt like they were touching my breasts and not my back or my shoulders." KS felt that Kumar intentionally touched her breasts. She explained she was "trying to keep my sides— my arms close to me so that he couldn't fit his fingers, but they kept goin.' " At her prior visits, the physical therapist assistant did not undo KS's bra or "come anywhere near" touching her breasts. KS explained that she told her referring physician that she would not be returning to Kumar's clinic, and she indicated that the physician reported the matter to the Michigan State Police.

JR testified that she worked for Kumar for a couple of weeks in 2011. She explained that Kumar "used to go up behind me and touch my thighs and rub the side of my legs," and that he would make sexual gestures to her. When JR informed Kumar that his actions made her uncomfortable, he said she was "a liar." Kumar told JR that if she reported him to the police she "would be in trouble, not him." JR stated that she quit working for him at that time, and she filed a police report with the Michigan State Police.

SM testified that she was formerly employed by Kumar as a physical therapist assistant. SM also performed massages and, in the winter of 2013 or 2014, she went to Kumar's home to give him a massage. The first massage occurred without incident. However, SM explained the second massage as follows:

> I started massaging, and he had a towel wrapped around him. And then he wanted to show me how to do it right. So, he jumped up and he took my shirt off, and he laid me down and started massaging me. And he had no underwear on.

SM "screamed" and was "very upset." She put her shirt back on and "ended up going in the bathroom to shave [Kumar's] back," which she was "fine" with. She indicated that she continued working for Kumar because she "needed the job." Approximately two weeks later, SM returned to Kumar's home to perform another massage. SM explained that on that occasion Kumar pushed her down on the bed "[a]nd he was just like on me. And it was awful. He was kissing my neck and everything . . . ." SM testified that she thought Kumar was going to rape her, but she managed to "[get] out from under him." She went downstairs, and as she was getting ready to leave, Kumar "came up behind me and grabbed my breast." SM said she continued to work for Kumar because "he had let up on me."

Following the hearing, administrative law judge (ALJ) dissolved the summary suspension. In October and December 2015, ALJ conducted additional hearings at which he heard TC's testimony, as described above, as well as the testimony of Dr. David Goldenbogen.

Dr. Goldenbogen testified that, in his opinion, the treatment KS received from Kumar did not violate the charged sections of the Public Health Code. Dr. Goldenbogen reviewed KS's testimony and her "clinical record." He testified that Kumar's massage of KS's "mid back region" would have pertained, in part, to "the serratus anterior" muscle. Referring to a textbook, he explained that "the [muscle] fibers themselves will actually insert into the rib cage themselves, so they originate around the shoulder blade and then wrap around to the front of the chest," and he speculated that "[t]his may be one of the muscles that Dr. Kumar was addressing, as far as muscle tightness." With regard to females, Dr. Goldenbogen explained that the muscle fibers "will actually form a little bit of the—they'll be underneath—like they'll be underneath the actual breast tissue itself." However, Dr. Goldenbogen stated that touching a patient's breasts for other than treatment purposes would be a departure from the standard of care and constitute a failure to exercise due care. He also testified that touching a patient's breasts in a sexual manner would be inconsistent with a lack of good moral character. Finally, he testified that he discusses with a patient beforehand if the treatment will require contact with a sensitive or private area and that he discusses with a patient the purpose of a treatment if the patient "tenses up."

The hearing concluded in March 2016. Kumar recalled TC as a witness and also called AS, one of TC's friends, to testify. AS testified that her mother was employed by Kumar. She also stated that in November or December 2015, TC told her that Kumar "never inappropriately touched her." TC, however, denied making that comment to AS.

In June 2016, the ALJ issued a proposed decision recommending that the disciplinary subcommittee dismiss the complaint. Subsequently, in November 2016, an order of *nolle prosequi* was entered in the criminal proceedings against Kumar, which dismissed the case without prejudice.

On January 10, 2017, the disciplinary subcommittee rejected the ALJ's conclusion that petitioner failed to prove violations of the Public Health Code by a preponderance of the evidence. The subcommittee determined that TC, JR, KS, and SM "all provided testimony that was compelling, consistent, relevant, and probative to the allegations in the complaint." The subcommittee first found that Kumar "used his position of authority to put [his former employees] in uncomfortable and compromising positions." The subcommittee then summarized TC's testimony, the Facebook messages, and Dr. Goldenbogen's testimony pertaining to a physical therapist's duty to inform a patient of the rendered treatment and to abstain from touching a patient's breasts for non-treatment purposes. The subcommittee concluded that petitioner proved the alleged violations of the Public Health Code by a preponderance of the evidence. It therefore suspended Kumar's license for a minimum of two years.

On January 30, 2017, Kumar moved the disciplinary subcommittee for a rehearing on the ground of "newly discovered evidence." In addition to the dismissal of the criminal charge, Kumar informed the subcommittee that he received affidavits from Cassandra and Sean Molloy "stating that the alleged victim in this matter confessed to both affiants that the alleged victim

had lied when she claimed there was improper contact between [Kumar] and herself." The subcommittee granted a rehearing for the purpose of receiving the new evidence.

The rehearing was held in June 2017 before an ALJ. The Molloys testified more or less consistently with the statements in their affidavits, and the ALJ issued a report summarizing the rehearing and noted that there were "some very minor issues with the credibility" of the Molloys. Nonetheless, he found the Molloys to be credible and found that Kumar "established, by more than a preponderance of the evidence, that TC told Mrs. Molloy (and that Mr. Molloy overheard TC say) that TC lied about at least some aspect of her encounter with the [Kumar]." However, the ALJ had not reviewed any other evidence relating to the case and therefore took "no position as to the relevance of this additional evidence and therefore makes no recommendation to the Board."

On October 27, 2017, the subcommittee issued an amended final order that reduced Kumar's suspension to a minimum of 18 months. The subcommittee acknowledged receipt of the rehearing report but did not make additional findings or provide reasoning in support of its decision to reduce the suspension.

## II. VIOLATION OF THE PUBLIC HEALTH CODE

### A. STANDARD OF REVIEW

On appeal, Kumar argues that the disciplinary subcommittee's orders are not supported by competent, material, and substantial evidence on the whole record. We review a disciplinary subcommittee's ruling in accordance with Const 1963, art 6, § 28. *Bureau of Prof Licensing v Butler*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 334687); slip op at 2. Const 1963, art 6, § 28 provides, in part:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

"The constitutional provision provides for review to determine: (1) that the decision is authorized by law, and (2) if a hearing is required, that the decision is supported by record evidence." *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 100; 754 NW2d 259 (2008). A hearing is required in professional disciplinary proceedings. *Dep't of Community Health v Anderson*, 299 Mich App 591, 597; 830 NW2d 814 (2013).

"[A]uthorized by law means allowed, permitted, or empowered by law." *Northwestern Nat'l Cas Co v Comm'r of Ins*, 231 Mich App 483, 488; 586 NW2d 563 (1998). Agency "[d]ecisions not 'authorized by law' include those that violate a statute or the Constitution, those that are in excess of statutory authority or an agency's jurisdiction, those made upon unlawful procedures that result in material prejudice, and those that are arbitrary and capricious." *Wescott*

*v Civil Serv Comm*, 298 Mich App 158, 162; 825 NW2d 674 (2012). "When reviewing whether an agency's decision was supported by competent, material, and substantial evidence on the whole record, a court must review the entire record and not just the portions supporting the agency's findings." *Dep't of Community Health v Risch*, 274 Mich App 365, 372; 733 NW2d 403 (2007).

> "[S]ubstantial evidence" is that which a reasonable mind would accept as adequate to support a decision. Substantial evidence is more than a mere scintilla but less than a preponderance of the evidence. Under this test, it does not matter that the contrary position is supported by more evidence, that is, which way the evidence preponderates, but only whether the position adopted by the agency is supported by evidence from which legitimate and supportable inferences were drawn. [*McBride v Pontiac Sch Dist*, 218 Mich App 113, 123; 553 NW2d 646 (1996) (citations omitted).]

"Moreover, if the administrative findings of fact and conclusions of law are based primarily on credibility determinations, such findings generally will not be disturbed because it is not the function of a reviewing court to assess witness credibility or resolve conflicts in the evidence." *Risch*, 274 Mich App at 372.

## B. ANALYSIS

The disciplinary subcommittee determinations that Kumar violated MCL 333.16221(a), (b)(*i*), and (b)(*vi*). MCL 333.16221 provides, in relevant part, that:

> [t]he disciplinary subcommittee shall proceed under section 16226 if it finds that 1 or more of the following grounds exist:
>
> (a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.
>
> (b) Personal disqualifications, consisting of 1 or more of the following:
>
> (*i*) Incompetence.
>
> &ast; &ast; &ast;
>
> (*vi*) Lack of good moral character. [MCL 333.16221(a), (b)(*i*), and (b)(*vi*).]

The disciplinary subcommittee must find by a preponderance of the evidence that grounds for discipline exist. See MCL 333.16237(4). In addition, MCL 333.16226 provides that suspension is a permissible sanction for violations of MCL 333.16221(a), (b)(*i*), and (b)(*vi*). MCL 333.16226(1).

As an initial matter, we address TC's testimony. The original ALJ found that her testimony lacked credibility. The disciplinary subcommittee, however, found her testimony was credible. On appeal, Kumar argues that the disciplinary subcommittee's rejection of the ALJ's finding was improper because, unlike the subcommittee, the ALJ had the opportunity to observe TC while she testified. However, MCL 333.16237(3) provides that the disciplinary subcommittee "may revise the recommended findings of fact and conclusions of law as determined necessary by the disciplinary subcommittee . . . ." Accordingly, we find no merit in Kumar's argument that the committee erred by rejecting the ALJ's credibility determination. Nevertheless, on rehearing, additional testimony questioning TC's credibility was presented, and, in response to that testimony, the disciplinary subcommittee reduced the suspension from a minimum of two years to a minimum of 18 months. It did not provide a rationale in support of its reduction, so we are left to guess whether it partially or wholly revised its finding about TC's credibility. We proceed, therefore, by assuming *arguendo* that TC lacks all credibility and that the disciplinary subcommittee did not rely on her testimony at all when imposing the minimum 18-month suspension. Thus, we only consider whether, the testimony from the other witnesses constituted competent, material, and substantial evidence on the whole record, so as to support the subcommittee's finding that Kumar violated the Public Health Code.

Turning to the first ground alleged against Kumar, we conclude that the subcommittee's determination that Kumar was negligent was supported by substantial evidence. As used in MCL 333.16221(a), "[n]egligence is a well-recognized legal concept which describes conduct that falls below a standard of reasonable or due care." *Sillery v Bd of Med*, 145 Mich App 681, 686; 378 NW2d 570 (1985). "A failure to exercise due care contemplates an abdication of responsibilities or carelessness in executing one's duties." *Id*. Additionally, intentional conduct can constitute a failure to exercise due care. *Id*. at 689 n 1.

Kumar does not dispute that he owed a duty of care to his patients. Instead, he argues that the disciplinary subcommittee erred in relying on KS's testimony given Dr. Goldenbogen's determination that the allegedly improper touching of the sides of her breasts was consistent with the standard of care for the treatment being provided. However, Dr. Goldenbogen's testimony is not as irrefutable as Kumar suggests. Dr. Goldenbogen merely speculated that Kumar was massaging a muscle on KS that wraps around the front of the human body, stating, "This *may* be one of the muscles that Dr. Kumar was addressing, as far as muscle tightness." Further, KS had received massages from a physical therapist assistant two or three times before seeing Kumar and during those massages the assistant did not undo KS's bra or "come anywhere near" touching her breasts. KS also testified that she believed that Kumar was intentionally touched her breasts.

Although the subcommittee did not expressly find that Kumar inappropriately touched KS's breasts, it relied on Dr. Goldenbogen's testimony that "touching a patient's breast for reasons other than treatment purposes is a failure to exercise due care and a departure from the standard of care." The subcommittee also found KS to be a credible witness. Thus, it is apparent that the subcommittee found that Kumar touched KS's breasts for non-treatment purposes. To the extent that Dr. Goldenbogen's testimony could support a contrary conclusion, this does not defeat the subcommittee's finding. See *McBride*, 218 Mich App at 123. Further, the propriety of Kumar touching KS's breasts during the massage was a matter within the subcommittee's expertise, to which we defer. See *Anderson*, 299 Mich App at 598. The

subcommittee additionally relied on Dr. Goldenbogen's testimony that a physical therapist's responsibility is to ensure that a patient is comfortable with the treatment being rendered and that the therapist should inform a patient of what exactly is going to take place, especially if the treatment involves a patient's breasts. Kumar provided no notice or explanation to KS before undoing her bra and touching her breasts. When she pulled her arms to her body "so that he couldn't fit his fingers," he was undeterred and continued his attempts to touch her. Accordingly, substantial evidence supports the subcommittee's finding that Kumar was negligent or failed to exercise due care. The same evidence supports the disciplinary committee's finding that Kumar was incompetent under MCL 333.16106(1) (defining "incompetence" as "a departure from, or failure to conform to, minimal standards of acceptable and prevailing practice for a health profession, whether or not actual injury to an individual occurs.").

Kumar also contends that substantial evidence does not support the disciplinary subcommittee's conclusion that he exhibited a lack of good moral character in violation of MCL 333.16221(b)(*vi*). " 'Good moral character' means good moral character as defined and determined under 1974 PA 381, MCL 338.41 to 338.47." MCL 333.16104(6). In turn, MCL 338.41(1) provides that "[t]he phrase "good moral character", or words of similar import, when used as a requirement for an occupational or professional license or when used as a requirement to establish or operate an organization or facility regulated by this state in the Michigan Compiled Laws or administrative rules promulgated under those laws shall be construed to mean the propensity on the part of the person to serve the public in the licensed area in a fair, honest, and open manner." Similar to the other statutory grounds for discipline previously discussed, the evidence relating to KS supported disciplinary subcommittee's finding that Kumar exhibited a lack of good moral character. The subcommittee relied on Dr. Goldenbogen's testimony "that a physical therapist touching a patient's breast in a sexual manner was consistent with a lack of good moral character." And as noted, there was substantial evidence showing that Kumar touched KS's breasts for non-treatment purposes, and it could be inferred from that evidence that Kumar was touching KS's breasts in a sexual manner.[3]

Finally, Kumar argues that the disciplinary subcommittee erred by not setting aside its original order following the rehearing and by instead merely reducing the length of his suspension. However, his argument that the subcommittee should have vacated its original order is premised on his contention that TC's allegations against him, which he argues constituted the "primary basis" for the disciplinary proceeding, were not credible in light of the testimony presented at the rehearing; further, Kumar argues, in the absence of TC's testimony, substantial evidence does not support the subcommittee's amended final order. However, even excluding TC's testimony from consideration, substantial evidence supports the disciplinary

---

[3] In light of our conclusion that the evidence relating to KS provided substantial evidence for the subcommittee's determinations that Kumar violated MCL 333.16221(a), (b)(*i*), and (b)(*vi*), we decline to address whether Kumar's Facebook messages to TC or the testimony of Kumar's former employees also supported these determinations. However, we note the Facebook messages, which are detailed in note 2 of this opinion, appear to support the disciplinary subcommittee's conclusions.

subcommittee's determination that Kumar violated multiple statutory grounds for discipline under the Public Health Code.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Michael J. Kelly
/s/ Colleen A. O'Brien