*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

3M COMPANY,

Plaintiff-Appellee,

v

DEPARTMENT OF ENVIRONMENT GREAT
LAKES AND ENERGY,

Defendant-Appellant.

FOR PUBLICATION
August 22, 2023
9:05 a.m.

No. 364067
Court of Claims
LC No. 21-000078-MZ

Before: GADOLA, P.J., and MURRAY and MALDONADO, JJ.

MURRAY, J.

The sole issue in this appeal is whether the trial court erred in holding that the Department of Environment, Great Lakes, and Energy (EGLE), violated Section 45 of the Administrative Procedures Act of 1969 (APA), MCL 24.201 *et seq.*, which requires agencies to prepare a regulatory impact statement (RIS) that includes an estimate of how much compliance with the proposed rules will cost "businesses and other groups." MCL 24.245(3)(n). For the reasons explained below, we conclude that the trial court did not err, and we therefore affirm its order granting summary disposition in favor of plaintiff.

## I. BACKGROUND

At issue is a new set of rules promulgated by EGLE that regulate the permissible levels of per- and polyfluoroalkyl substances (PFAS) in drinking water pursuant to Section 5 of the Safe Drinking Water Act (SDWA), MCL 325.1001 *et seq.*[1] It is undisputed that implementation of these rules causes changes to groundwater-cleanup standards pursuant to Part 201 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*[2] This is because

---

[1] See MCL 325.1005(1)(b).

[2] See MCL 324.20120a(5).

groundwater-cleanup standards are tied to drinking water rules; therefore, any changes to the drinking water rules also cause a change to the groundwater-cleanup rules.

A lengthy administrative process took place prior to the implementation of these rules. In March 2019, a Science Advisory Workgroup was established to review existing and proposed drinking-water standards for PFAS. A month later, the Workgroup indicated that more than 70 sites were being investigated for contamination for two specific PFASs: perfluorooctane sulfonate (PFOS) and perfluorooctanoic acid (PFOA). Soon after, EGLE proposed to create rules to establish enforceable drinking-water standards for PFAS. In doing so, EGLE indicated that the United States Department of Environmental Quality had designated health-advisory levels for PFOS and PFOA, but EGLE determined that the lack of enforceable standards for those chemicals and other PFAS impaired its ability to act to protect human health and the environment. Thus, a new ruleset was proposed, designated as 2019-35 EG, or "Supplying Water to the Public," which was to add additional drinking water standards and related sampling and response requirements.

In October 2019, EGLE's Drinking Water and Environmental Health Division submitted an RIS for proposed ruleset 2019-35 EG. In the RIS, the primary costs to state and local governmental units were identified as arising from sampling and monitoring requirements and the installation and operation of treatment systems where PFAS exceeded the maximum contaminant levels. Regarding costs imposed on businesses and groups, EGLE addressed only businesses that operated their own water supplies and estimated the following:

| | Government | | Businesses | |
|---|---|---|---|---|
| | Unit Cost | Annual | Unit Cost | Annual |
| Sampling cost | $300 per sample | $3.2 mil | $300 to $600 per sample | $4 mil |
| Treatment cost | $8 per gal | $7.4 mil | | |
| Maintenance cost | $0.35 per gal | $325,000 | | $7,000 |
| Installation of treatment | | | one time $920,000 | |

The costs were to be the same for businesses and other groups except that sampling would cost $600 per sample if the business or group hired an outside contractor rather than doing the sampling itself.

After an October 2019 meeting of the Environmental Rules Review Committee, EGLE's Regulatory Affairs Officer, David Fiedler, responded to a question regarding the estimated impact on small businesses and other stakeholders "when the PFOA and PFOSs criteria are changed under Part 201" by stating:

> If an entity is responsible for either causing a PFAS release or being responsible for the due diligence associated with a PFOS or PFOA release under Part 201, then they would be obligated to meet these standards. This impact will vary depending on the PFOS or PFOA concentration, media effected [sic], and extent of contamination. Because of this variability, it is not practical to determine the impact of this change. Even if it was, this impact is a result of current statutory applicability not a regulatory requirement.

The next month, a second RIS was prepared. The revised RIS recognized that the new surface water standards would alter the standards for groundwater cleanup: "There are surface water

standards and groundwater-cleanup standards. The groundwater-cleanup standards for PFOA and PFOS will be changed as a result of the rule."

Public hearings were held on 2019-35 EG in January 2020, and the Review Committee approved a final draft of the rules in February. The Office of Regulatory Reinvention, an office within the Department of Licensing and Regulatory Affairs, MCL 445.2031(*I*)(A), approved the proposed drinking-water rules after determining that they were within the scope of EGLE's authority, did not violate constitutional requirements, and conformed to APA requirements. The Joint Rules Committee did not act on the proposed rules during the 15 session days following their receipt, making the rules effective on August 3, 2020. See MCL 24.245a(1), (3).

3M Company subsequently filed suit seeking declaratory and injunctive relief regarding the drinking-water standard's rules for PFAS. According to 3M Company, EGLE had not fully accounted for all costs associated with the rules, as it had not estimated costs for businesses to comply with the related groundwater-cleanup standards that automatically result from the new drinking water rules. Because every RIS was required to contain an estimate of the compliance costs for businesses and other groups, EGLE's RIS was deficient as it had not accounted for costs resulting from changes to the separate, but related, groundwater-cleanup standards. Accordingly, 3M Company asserted that EGLE had not complied with the APA-based RIS requirements, and the drinking water rules were invalid.

The parties filed competing motions for summary disposition pursuant to MCR 2.116(C)(10). After a hearing, the Court of Claims issued a thorough opinion and order granting summary disposition in 3M Company's favor and declaring the new drinking water rules invalid. Although the court determined that most of 3M's arguments did not carry the day, the court held that the RIS was deficient for lack of a cost estimate for groundwater cleanup, reasoning:

> Specifically, nowhere in the Part 201 RIS did the Department address any cleanup or compliance costs that a business or group would incur as a result of the PFAS rules. In fact, it was the exact opposite—the Department actually relied on the criteria set for PFOA and PFOS as a result of the SDWA-rulemaking process to justify its decision to ignore any cleanup and compliance costs faced by businesses and groups with respect to the other five PFAS substances under Part 201. Thus, the costs to businesses and groups of complying with the PFOA and PFOS groundwater criteria were never considered in either rulemaking proceeding, and the Department asserted in the Part 201 RIS that regulating the other five PFAS would not lead to additional costs because those costs would already be incurred due to the PFOA and PFOS rules.

> A court must give a certain amount of deference to an administrative department's rulemaking process. *Brang, Inc v Liquor Control Comm*, 320 Mich App 652, 661; 910 NW2d 309 (2017). But judicial deference is not infinitely elastic—our Legislature has made clear that, when promulgating a rule, administrative departments must comply with certain standards, and one of those is estimating "the actual statewide compliance costs of the proposed rule on businesses and other groups" and including that information in the regulatory-impact statement. MCL 24.245(3)(n). A department cannot skirt this statutory

requirement during Rulemaking A by promising to address the costs later in Rulemaking B, but then when later comes, ignoring the costs in Rulemaking B because the criteria were already set in Rulemaking A, and then, on top of this, characterizing all of the ignored costs as actually zero because they are sunk costs. To do this would be to play a shell game with the public.

The court, on its own motion, stayed the effect of its holding to grant time for appellate review of its decision.

## II. STANDARDS OF REVIEW

Const 1963, art 6 § 28, provides the scope of review for an administrative agency's decision:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

"[W]hen a hearing is not required, courts review an agency decision only under the 'authorized by law' standard . . . ." *Henderson v Civil Serv Comm*, 321 Mich App 25, 39; 913 NW2d 665 (2017).[3] "An agency decision is not authorized by law if it violates constitutional or statutory provisions, lies beyond the agency's jurisdiction, follows from unlawful procedures resulting in material prejudice, or is arbitrary and capricious." *Dearborn Hts Pharmacy v Dep't of Health & Human Servs*, 338 Mich App 555, 559; 980 NW2d 736 (2021) (quotation marks and citation omitted).

Courts review de novo questions of law, including whether an agency's action complied with a statute. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 100-101; 754 NW2d 259 (2008). The normal rules of statutory interpretation apply when interpreting statutes concerning agency decisions. *Dearborn Hts Pharmacy*, 338 Mich App at 560. If the language is clear and unambiguous, this Court may not engage in judicial construction. *Id.* (citation omitted). And, if the statute does not define a word, this Court applies the common meaning of nontechnical words, while also considering the placement of the words and phrases in the statutory scheme. *Id*. (citation omitted). Words must be read and understood within their grammatical context. *Mich Charitable Gaming Ass'n v Michigan*, 310 Mich App 584, 592; 873 NW2d 827 (2015).

---

[3] A contested case is "a proceeding, including rate-making, price-fixing, and licensing, in which a determination of the legal rights, duties, or privileges of a named party is required by law to be made by an agency after an opportunity for an evidentiary hearing." MCL 24.203(3). A noncontested case is any case that falls outside this definition. *Mich Ass'n of Home Builders v Dir of Dep't of Labor & Economic Growth*, 481 Mich 496, 498; 750 NW2d 593 (2008).

Respectful consideration is given to an agency's interpretation of the statute that it is charged with executing, and we may not overrule that interpretation without cogent reasons. *Rovas*, 482 Mich at 103. " '[R]espectful consideration' is much like what we give to a trial court's view of a legal issue on de novo review." *Stirling v Leelanau Co*, 336 Mich App 575, 578 n 2; 970 NW2d 910 (2021), rev'd on other grounds *Stirling v Leelanau*, ___ Mich ___; ___ NW2d ___ (2023) (Docket No. 162961).

## III. DISCUSSION

The APA governs the creation of agency rules and regulations. *Mich Charitable Gaming*, 310 Mich App at 594. "An agency's failure to follow the process outlined in the APA renders a rule invalid." *Id*. One of the processes that the agency must follow is the creation of an RIS. MCL 24.245(3). "The regulatory impact statement must contain . . . [a]n estimate of the actual statewide compliance costs of the proposed rule on businesses and other groups." MCL 24.245(3)(n). Section 5 of the SDWA requires EGLE to promulgate rules setting "[s]tate drinking water standards and associated monitoring requirements, the attainment and maintenance of which are necessary to protect the public health." MCL 325.1005(1)(b).

Pursuant to this statutory command, EGLE promulgated ruleset 2019-35 EG, establishing new standards for PFAS in drinking water. As noted, however, under Part 201 of the NREPA, once new drinking water standards are promulgated under Section 5 of the SDWA, the cleanup criterion for hazardous substances in groundwater are also changed. MCL 324.20120a(5). In other words, the impact of Part 201 is that whenever EGLE sets drinking water standards, it is also setting groundwater cleanup criterion. Despite this, EGLE refrained from providing compliance cost estimates for the new groundwater cleanup criterion in the RIS it prepared for the new drinking water standards, arguing that because MCL 24.245(3)(n) only requires it to estimate costs of *the proposed rule*, it only needed to provide a cost estimate for businesses and other groups to comply with the drinking-water rule; it did not need to provide an estimate of the costs that businesses and other groups might incur as a result of the groundwater-cleanup provisions found in Part 201 of NREPA.

It is true that MCL 24.245(3)(n) provides that the agency must include in its RIS "[a]n estimate of the actual statewide compliance costs *of the proposed rule* on businesses and other groups." (Emphasis added.) We don't quibble with EGLE's position that within MCL 24.245(3)(n) the word "the" modifies the phrase "proposed rule," and that the proposed rule is 2019-35 EG, "Supplying Water to the Public." But the statute has to be read in its entirety, and what MCL 24.245(3)(n) requires is that EGLE provide an estimate "of the actual statewide compliance costs of" the proposed rule. And as we have described above, and as the parties agree, "the proposed rule[s]" resulted in modified groundwater criteria, which triggered the possibility of additional "statewide compliance costs." It is that triggering effect from adoption of "the proposed [drinking water]" rules that brought into play EGLE's statutory obligation to provide "an estimate of the actual statewide compliance costs" of any required groundwater cleanup resulting from adoption of the proposed drinking water rules.

Although EGLE identified the estimated actual statewide compliance costs of the proposed drinking-water rule on businesses and groups, it did not estimate costs that these changes automatically imposed on groundwater cleanup. Failing to do so resulted in EGLE's

-5-

noncompliance with MCL 24.245(3)(n), which in turn means the rules were not promulgated in compliance with the APA, and are invalid. MCL 24.243; *Goins v Greenfield Jeep Eagle, Inc*, 449 Mich 1, 9-10; 534 NW2d 467 (1995).[4]

EGLE's argument that it was not required to estimate the costs to businesses that would necessarily occur under Part 201 because it lacked the necessary information to make an estimate does not save the day as the applicable statutory provisions say otherwise.

MCL 24.245(3) provides that an agency must prepare a RIS which "shall" contain all of the listed information, meaning that providing the information is mandatory. *Walters v Nadell*, 481 Mich 377, 383; 751 NW2d 431 (2008). And as noted earlier, one piece of information that the APA requires to be included in a RIS is "[a]n estimate of the actual statewide compliance costs of the proposed rule on businesses and other groups." MCL 24.245(3)(n).

According to EGLE, it was permitted to determine that it was factually incapable of making an estimate and that the Court of Claims should have deferred to its administrative expertise when making that determination. However, MCL 24.245(3)(n) does not contain any such exception, and to adopt EGLE's position would require this Court to read an exception into MCL 24.245(3)(n) that would allow EGLE, as well as any other departments of state government, to avoid estimating costs to businesses in a RIS if the department concludes an estimate is not possible. But MCL 24.245(3)(n) requires an estimation, and if EGLE cannot provide one, then it cannot propose the rule in a way that complies with the APA.

Affirmed. No costs, a matter of public concern being at issue. MCR 7.219(A).


/s/ Christopher M. Murray
/s/ Michael F. Gadola

---

[4] EGLE challenges the trial court's review of the RIS subsequently adopted for groundwater cleanup, which likewise contained no numerical cost estimate. According to EGLE, the trial court had no authority to consider that RIS because it was not part of the administrative record. As Judge SMOLENSKI previously wrote for this Court, a court is expressly permitted to take judicial notice on its own of those laws set out in MRE 202(a), which includes a state administrative regulation. *Rudolph Steiner Sch of Ann Arbor v Ann Arbor Charter Twp*, 237 Mich App 721, 723 n1; 605 NW2d 18 (1999). However, a RIS is not an administrative regulation, nor does that document fall within one of the other laws that a court can judicially notice. But this error was harmless, as the statutory language supports the trial court's ultimate holding.