*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* APPLICATION OF DTE ELECTRIC
COMPANY FOR 2020 RECONCILIATION.

---

ASSOCIATION OF BUSINESSES ADVOCATING
TARIFF EQUITY,

UNPUBLISHED
July 11, 2024

Appellant,

v

No. 365037
Public Service Commission
LC No. 00-020528

MICHIGAN PUBLIC SERVICE COMMISSION,

Appellee,

and

DTE ELECTRIC COMPANY,

Petitioner-Appellee.

---

Before: MALDONADO, P.J., and K. F. KELLY and REDFORD, JJ.

PER CURIAM.

Association of Businesses Advocating Tariff Equity (ABATE) appeals as of right an October 27, 2022 order of the Michigan Public Service Commission (PSC or Commission) approving with modifications petitioner, DTE Electric Company's (DTE or DTE Electric) application for approval to reconcile its power supply costs and revenues for calendar year 2020. On appeal, ABATE argues that the PSC erred in its interpretation and application of MCL 460.6j(13)(c), which provides for a disallowance of "net increased costs attributable to a generating plant outage of more than 90 days in duration unless the utility demonstrates by clear and satisfactory evidence that the outage, or any part of the outage, was not caused or prolonged by the utility's negligence or by unreasonable or imprudent management." ABATE contends that the PSC used a standard inconsistent with the statutory text, failed to consider relevant evidence, and

erroneously denied ABATE's petition for rehearing. ABATE's arguments are unavailing. We therefore affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

This Court recently issued a published opinion in a PSC case involving the same generating plant outage that is at issue in the present case. See *In re Application of Consumers Energy Co for Reconciliation*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362931); slip op at 2-4, lv pending. In that opinion, this Court explained the reconciliation process in PSC cases:

> In Michigan, an energy utility estimates its upcoming power-supply costs as part of its rate-setting process. Like any estimate, the utility's estimate can be off, sometimes way off. Anticipating the problem of how to reimburse a utility for increased power-supply costs, our Legislature enacted a reconciliation process, by which the utility can apply to the Public Service Commission (PSC) to increase upcoming rates to help recoup prior unanticipated costs.

> Not all missed estimates are, however, created equal—some are due to acts outside of the utility's control, while others result from the utility's negligence or imprudent management. In a lightly regulated market, short sellers, hostile takeovers, proxy wars, and the like, serve as the discipline against poor estimates by management. In a highly regulated market like the one for energy in Michigan, however, that discipline must primarily come from elsewhere. Relevant here, our Legislature has conditioned a utility's recoupment of under-recovered costs on that utility having acted reasonably and prudently with respect to decisions impacting those costs. [*Id*. at 2.]

This Court further explained:

> To better understand this dispute, it is helpful to look briefly at how the energy market in Michigan deals with large-scale power outages. When an electricity-generating facility has an outage, or when the demand for electricity in a given area is unexpectedly high, the utility that services the affected area will provide replacement electricity to its affected customers. The replacement electricity often comes from electricity-generating facilities owned by other utilities, and this electricity is exchanged on a market for "wholesale electricity." Midcontinent Independent System Operator, Inc. (MISO) oversees the market for wholesale electricity in much of Michigan, and utilities can purchase and sell "zonal credits" through MISO's "planning resource auction." In essence, a "zonal credit" represents the right of the credit holder to a unit of deliverable "unforced capacity" that can be bought or sold on the MISO-managed market.

> The cost of this replacement electricity is generally higher than the cost of the electricity generated by a utility's own facility. A utility can include the higher cost of replacement electricity in its cost-recovery plan so that consumers bear the ultimate burden of the higher cost, as opposed to the utility. If, at the end of the year, the utility faces an "underrecovery" of power-supply costs, then that utility

can seek to "true up" the actual costs of power supply with its earlier, too-low estimate through the PSC's reconciliation process. The costs are passed along to consumers in the form of higher future rates. [*Id*.]

The outage at issue occurred at Unit 3 of the Ludington Pumped Storage Plant (sometimes referred to as Ludington Unit 3, Unit 3, or Ludington 3). *Id*. at 2-3. Consumers Energy Company (Consumers Energy) owns 51% of the Ludington Pumped Storage Plant, and DTE owns the other 49%. *Id*. at 3. In a joint project, Consumers Energy and DTE engaged a contractor, Toshiba America Energy Systems Corporation (Toshiba), to provide upgrades to the Ludington Pumped Storage Plant. *Id*. at 2-3. As part of this project, an outage at Ludington Unit 3 was planned. *Id*. "The upgrades and consequent outage had an original estimated completion date in Spring 2020, 140 days after it began." *Id*. at 2. But the outage was eventually extended to include the entire year of 2020 following the discovery of material defects in a discharge-ring extension (DRE) that was manufactured and installed by Toshiba. *Id*. at 2-3. Following Toshiba's unsuccessful repair efforts, Consumers Energy directed Toshiba to design and manufacture a new DRE. *Id*. at 3.

As a result of the extended outage, Consumers Energy purchased replacement electricity and "sought reconciliation between its estimated and actual power-supply costs for the year." *Id*. at 3. The Michigan Department of Attorney General (Attorney General) and ABATE intervened in Consumers Energy's reconciliation case. *Id*. The Attorney General and ABATE opposed Consumers Energy's requested reconciliation related to the Ludington Unit 3 outage because "the utility's increased power costs resulted from its unreasonable and imprudent management under MCL 460.6j." *Id*. In addition, ABATE "argued, in the alternative, that Consumers Energy generated revenue from the sales of its zonal credits through MISO, and that revenue should be included in the overall calculus as an offset against the higher cost of replacement power." *Id*.

> ABATE provided written testimony from a consultant. The consultant noted that Consumers Energy's revenue from selling zonal credits was larger than its under-recovery of power-supply costs for 2020. The consultant argued that Consumers Energy would not have realized the increased revenue from sales of the zonal credits but-for the extended outage of Unit 3. Given this, the consultant concluded that the PSC should offset any purported under-recovery of Consumers Energy by that utility's revenues generated from the sale of its zonal credits. [*Id*.]

However, the Attorney General's "expert disagreed that the increased revenue from the sale of zonal credits could be attributed to the outage; instead, the spot-price of zonal credits depended on a myriad of factors, including capacity-import limits. To illustrate, the expert pointed to significant price fluctuations for the credits throughout Unit 3's extended outage." *Id*. at 3-4.

Administrative Law Judge Sally L. Wallace (ALJ Wallace) recommended that the PSC reject Consumers Energy's requested reconciliation related to the Ludington Unit 3 outage extension but allow Consumers Energy "to keep certain damages it might collect from Toshiba related to the defective equipment." *Id*. at 4. ALJ Wallace "found that the outage was a result of Toshiba's errors in the manufacture and installation of the [DRE], and, in overseeing and managing its contractor, Consumers Energy did not meet the standard for recouping costs under MCL 460.6j(13)(c)." *Id*. ALJ Wallace rejected ABATE's alternative argument because "the revenues that Consumers Energy collected from the sale of zonal credits could not be attributed solely to

the Unit 3 outage, and therefore those revenues could not offset the increased power-supply costs." *Id*. The PSC followed ALJ Wallace's recommendation, concluding "that the replacement power costs were incurred as a result of the errors of Toshiba and that Toshiba was acting as an agent of Consumers Energy under the overall supervision of the utility." *Id*. (quotation marks and brackets omitted). "The PSC rejected ABATE's alternative argument for reasons similar to those set forth by [ALJ Wallace]." *Id*.

Consumers Energy filed an appeal, and ABATE filed a cross-appeal. *Id*. This Court agreed with the PSC that Consumers Energy "provided unreasonable or imprudent management (or, put another way, failed to provide reasonable and prudent management) with respect to the outage, causing the very increased costs of which it now complains." *Id*. at 2 (quotation marks omitted). "[T]he outage arose primarily from errors committed by Toshiba as supervised by Consumers Energy. The PSC did not err in disallowing the recovery of replacement power costs associated with the extension of the Unit 3 outage." *Id*. at 7. This Court did not reach the merits of ABATE's cross-appeal. *Id*. This Court explained:

> During oral argument, the Court confirmed that the issues raised in the cross appeal would have practical effect only if the Court were to agree with Consumers Energy on its main appeal. Although ABATE raises interesting, substantive issues of statutory interpretation and pricing of zonal credits on the MISO market, even if this Court were to agree with ABATE, this would not alter the end result—i.e., Consumers Energy's requested reconciliation of costs associated with the Unit 3 extended outage was properly rejected by the PSC. Any analysis of the merits would be dicta, and, therefore, resolution of the issues raised by ABATE will have to wait another day. [*Id*.]

This Court thus affirmed. *Id*. at 2, 7.

We now turn to the procedural history of the present case. On March 31, 2021, DTE filed in the PSC an application for approval to reconcile its power supply costs and revenues for 2020. The PSC Staff (the Staff) participated in the proceedings, and intervenor status was granted to the Attorney General and ABATE, among others. Administrative Law Judge Sharon L. Feldman (ALJ Feldman) conducted an evidentiary hearing on February 28, 2022. Our summary of the testimony presented at the evidentiary hearing is limited to that which is relevant to this appeal.[1]

James R. Dauphinais testified on behalf of ABATE. Dauphinais is "a consultant in the field of public utility regulation and a Managing Principal with the firm of Brubaker & Associates, Inc. ('BAI'), energy, economic and regulatory consultants."

Dauphinais testified that the extended outage of Ludington Unit 3 was attributable to Toshiba's failure to properly design and install the DRE. This caused DTE to incur additional net power supply costs in 2020. As a result of the extension of the outage beyond the planned end date of May 20, 2020, "DTE's share of Ludington Unit 3 was unavailable to DTE in calendar year

---

[1] There were multiple issues in this reconciliation proceeding that were unrelated to the Ludington Unit 3 outage extension, and none of those other issues are pertinent to this appeal.

2020 after May 20, 2020[,] to store and release energy. This affected DTE's energy purchases and sales from and to the MISO day-ahead and real-time energy markets." "In addition, due to the extension of the outage, DTE's share of Ludington Unit 3 was disqualified by MISO from being able to provide capacity (Zonal Resource Credits, or ZRCs, MISO's 'currency' for capacity) for the MISO 2020-2021 Planning Year. This adversely affected DTE's net ZRC position with MISO." Dauphinais estimated DTE's additional net energy-related power supply costs incurred in 2020 due to the Ludington Unit 3 extended outage to be $1.141 million.

Dauphinais testified that DTE had claimed an increase in capacity-related costs of $14.081 million for 2020 over the planned cost projections for that year. Dauphinais viewed this amount as unsupported. Also, DTE had not proposed returning to customers "approximately $5.185 million [sic: $5.815 million] in Zonal Deliverability Benefit ('ZDB') credits that DTE has received from MISO in 2020."[2] DTE should be required to return those ZDB credits to customers.[3]

When asked if he had been able to estimate the capacity-related power supply costs that DTE had incurred in 2020 due to the Ludington Unit 3 outage extension, Dauphinais testified that he had been partially able to do so. He could not fully do so because of the large discrepancy "between the 2020 capacity-related variance of $14.081 million that DTE has claimed and my estimate of that variance, prior to deducting ZDB credits, of $7.225 million." Dauphinais "estimate[d] the 2020 capacity-related variance that would have resulted if the Ludington Unit 3 outage had not been extended to be $3.319 million." Dauphinais explained, "Subtracting this amount off of my $7.225 million estimate of the capacity-related variance with the Ludington Unit 3 outage extension yields an estimate of the portion of the additional capacity-related power supply costs caused by the extension of the Ludington Unit 3 outage that I can readily estimate to be approximately $3.906 million."

Dauphinais thus opined that Toshiba's failures in designing and installing the DRE had "caused DTE to incur in 2020 approximately $1.141 million in additional energy-related power supply costs and at least $3.906 million in additional capacity-related power supply costs." Because the outage extension was caused by the deficient performance of Toshiba, the contractor for Consumers Energy and DTE, Dauphinais opined that DTE's shareholders rather than its ratepayers should be responsible for the additional power supply costs that DTE incurred in 2020

---

[2] It appears that the reference to $5.185 million was a typographical error because other portions of Dauphinais's written testimony referred to $5.815 million in ZDB credits.

[3] Dauphinais provided the following explanation of ZDB credits:

> When a MISO Zone, such as Zone 7, clears at a higher price than the surrounding MISO zones, MISO will collect capacity payments in excess of those it needs to pay out to planning resources. This is because the transmission system allows for a portion of the load in the affected zone to be served from capacity located outside of that zone. When this excess capacity payment situation occurs, MISO pays out the excess payments to all Load Serving Entities ("LSEs") in the form of ZDB credits.

as a result of the outage extension. It was the responsibility of DTE, not its ratepayers, to ensure that DTE's contractor performed its work correctly.

Dauphinais further explained that the additional net power supply costs that DTE incurred in 2020 as a result of the Ludington Unit 3 outage extension included

> approximately $1.141 million in additional energy-related power supply costs and approximately $3.906 million in additional capacity-related power supply costs. However, due to the discrepancy I have discussed between DTE's claimed capacity-related power supply cost variance for 2020 of $14.081 million and my estimate of the same of $7.225 million, a larger capacity-related power supply cost recovery disallowance may be warranted.

> That said, to the extent the Commission requires DTE to return its $5.815 million in 2020 MISO ZDB credits to PSCR [power supply cost recovery] customers as I recommended earlier in my testimony, those ZDB credits should be applied as offset against the disallowed amounts since DTE would not have received those ZDB credits from MISO but for the extension of the Ludington Unit 3 outage causing MISO Zone 7 to clear at the MISO CONE [cost of new entry] price of $257.53 per MW[megawatt]-day.

Sebastian Coppola testified on behalf of the Attorney General. Coppola is "a business consultant specializing in financial and strategic business issues in the fields of energy and utility regulation." He has more than 30 years of experience "in public utility and related energy work, both as a consultant and utility company executive."

Coppola opined that it would be unjust and unreasonable to require customers to pay for higher power costs that resulted from Toshiba's errors in installing equipment at Ludington Unit 3. Coppola thus recommended that the PSC "disallow $1,141,335 from the total power cost recovery amount proposed by [DTE] in this case."

Coppola provided testimony to rebut Dauphinais's testimony associating ZDB credits received by DTE in 2020 with the Ludington Unit 3 outage extension. According to Coppola, Dauphinais had incorrectly assumed "that the Ludington 3 extended outage and exclusion of the related capacity from the 2020/2021 MISO PRA [planning resource auction] was the cause of the run-up in the auction price and the resulting ZDB credits received by [DTE]."

Coppola agreed with Dauphinais "that the incremental power costs of $1.141 million caused by the extended outage at the Ludington 3 unit should be disallowed" and "that ZDB credits received by [DTE] should be passed through to PSCR customers in this reconciliation case." But Coppola further opined that Dauphinais "incorrectly concludes and recommends that the Commission should offset the $1.141 million disallowance with ZDB credits that [DTE] may have failed to pass-through to customers in the 2020 PSCR reconciliation filing." Coppola explained his disagreement with Dauphinais's analysis on this point:

> Mr. Dauphinais assigns the entire amount of ZDB credits received by [DTE] from June 1, 2020 to December 31, 2020 (214 days) to the Ludington 3 outage. The credits are the result of MISO sharing with utilities or Local Serving Entities (LSEs)

the excess revenue collected from importing power from outside Zone 7 at lower prices than the $257.53 per MW/day it charged LSEs within Zone 7 to fill the capacity shortage in Zone 7 during the 2020/2021 plan year.

Assigning the entire share of credits received by [DTE] to the Ludington 3 outage is inappropriate. There is no direct link between the ZDB credits received by [DTE] and the Ludington 3 extended outage. MISO has not issued any reports attributing the 2020/2021 PRA price of $257.23 [sic: $257.53] or any portion of the capacity shortage to Ludington 3.

Coppola referred to DTE's discovery responses regarding "the reasons for the $257.53 auction price and what role Ludington 3 and other factors may have played in the high auction price and resulting ZDB credits . . . ." In particular, Coppola quoted the following answer provided by DTE during discovery:

The MISO Local Clearing Requirement (LCR) for Planning Year 2020 was 21,850.7 ZRCs. This requirement is determined annually by MISO through their Loss of Load Expectation (LOLE) analysis. The LOLE analysis updates the Capacity Import Limit (CIL) for Zone 7 and the Local Reliability Requirement (LRR), both of which are used to set the Local Clearing Requirement. The LCR must be met with resources that have ZRCs physically located within Zone 7, otherwise the Zone with [sic] clear at a price of CONE. The Zone 7 resources in Planning Year 2020 amounted to 21,727.5 ZRCs which was short of the LCR. The CIL, LRR (and corresponding impact on LCR) as well as in Zone 7 Resource ZRCs resulted in the Zone clearing at CONE.

Coppola also quoted the following questions posed to DTE in discovery and DTE's answers thereto:

*Q.* (c) From MISO's reports for the 2020-2021 plan year, it appears that the Planning Reserve Margin Requirement (PRMR) of 21,945.3 MW (ZRCs) in Zone 7 exceeded the Local Clearing Requirement (LCR) of 21,850.7 MW (ZRCs) by approximately 95 MW (ZRCs). Please explain what role [DTE] believes this relatively small difference between the PRMR and the LCR had on the $257.53 capacity auction price for the 2020-2021 plan year. Provide evidence to support your conclusion.

*A.* The 95 MW (ZRCs) is the Zone 7 effective capacity import limit (ECIL) for Planning Year 2020. This essentially restricts external resources to Zone 7 from clearing more than 95 MW in the Planning Resource Auction to meet the PRMR since both the LCR and PRMR must be met. All of the variables (Local Reliability Requirement (LRR), CIL, PRMR) have an impact in the equation $ECIL = PRMR - (LRR - CIL)$. The ECIL, LCR as well as the amount of local Zone 7 generation capacity play a part in setting the Planning Resource Auction price. ECIL was fully utilized in Planning Year 2020 so I would expect that had ECIL been a larger value, likely more imports would have cleared for Zone 7.

*Q.* (d) Explain what role the unavailability of the Ludington 3 capacity for the year 2020 had on the $257.53 capacity auction price in Zone 7 for the 2020/2021 MISO plan year. Provide evidence to support your conclusion.

*A.* Ludington 3 is a generation resource in Zone 7 and would count towards meeting the LCR had it been available. Its role on the $257.53 capacity auction price is unknown as it is just one piece of all the variables.

In light of these discovery responses from DTE, Coppola found it "readily apparent" that DTE "is not attributing the high auction price, and thus the related ZDB credits in the 2020/2021 MISO planning year, to the Ludington 3 extended outage." Coppola continued:

In summary, there is no direct evidence to support Mr. Dauphinais'[s] assumptions, calculations and conclusions in his direct testimony. Therefore, Mr. Dauphinais'[s] recommendation that $5.815 million of ZDB credits should offset the proposed disallowance of replacement power costs for the Ludington 3 extended outages is invalid and should be dismissed by the Commission.

Coppola testified that the Ludington Unit 3 capacity was excluded not only from the 2020-2021 MISO PRA but also from the 2021-2022 MISO PRA because DTE "expected the outage to extend more than 120 days past the start of the 2021/2022 MISO planning year starting June 1, 2021." Coppola further explained:

For the 2021/2022 PRA, the capacity auction price for Zone 7 reverted back to $5.00 per MW/day, which matched the price for most of the other zones in the MISO territory. If the Ludington 3 extended outage had been the cause of the auction price run-up to $257.53 in Zone 7 in the 2020/2021 PRA, it should also have caused a similar high price in the 2021/2022 PRA. However, despite the fact the Ludington 3 generating capacity was not included in the 2021/2022 PRA, the auction price dropped to $5.00 from $257.53 in the prior year. This is another indication that the $257.53 auction price in the 2020/2021 PRA and the related ZDB credits cannot be attributed to the Ludington 3 extended outage, contrary to Mr. Dauphinais'[s] conclusion. The MISO auction process involves several generating resources in the Michigan Lower Peninsula and other factors, such as Capacity Import Limits (CIL) and export limits, which can have a profound effect on the outcome of the auction price.

Coppola thus opined that Dauphinais had incorrectly assumed "that the Ludington 3 extended outage and exclusion of the related capacity from the 2020/2021 MISO PRA was the cause of the run-up in the auction price and the resulting ZDB credits received by [DTE]." There were "no determinative findings in [Dauphinais's] testimony about any direct link between the Ludington 3 outage and the 2020/2021 PRA price." Dauphinais "simply speculates about a connection between the Ludington 3 capacity not being included in the 2020/2021 auction and the ZDB credits received by [DTE] in 2020." Coppola therefore urged the PSC to "disregard Mr. Dauphinais'[s] conclusions and recommendation to offset the proposed incremental energy cost disallowance of $1.141 million for the Ludington 3 extended outage with the ZDB credits received by [DTE]."

However, Coppola criticized DTE for a lack of transparency with respect to the provision of critical information needed by the Attorney General and ABATE regarding capacity costs. Coppola agreed with Dauphinais that DTE did not disclose whether it had offset capacity costs with capacity-related revenue in the form of ZDB credits. Coppola noted DTE's "refusal to provide sufficient information to support large variances in capacity costs between actual and forecasted amounts, and also the pass-through of ZDB credits to PSCR customers." In Coppola's view, if DTE failed to provide evidence that $6,071,002 in ZDB credits received by DTE had been offset from capacity costs, then the PSC should reduce DTE's proposed costs by that amount.

Shawn D. Burgdorf testified on behalf of DTE. Burgdorf is employed by DTE as "the Manager of the Power Supply Strategy & Modeling team within the General Optimization department." He has a bachelor's degree in mechanical engineering and a master's degree in business administration.

Burgdorf provided testimony to rebut Dauphinais's testimony regarding capacity cost variances. Burgdorf testified that Dauphinais was incorrect in asserting that DTE had "failed to credit our customers with zonal capacity credits and those should be returned to DTE's PSCR customers." Burgdorf explained:

> [T]he MISO billing process aggregates the capacity charges/credits into one line item on the billing statements. The zonal credits are automatically applied by MISO to [DTE's] billing on a monthly basis. No further action is required on the part of [DTE] for our customers to receive this credit from MISO and [DTE's] customers are, in fact, receiving the credit.

Burgdorf had his "team calculate the billing charges that make up the value in the capacity cost line item," and this calculation "demonstrate[d] that the Zonal Deliverability Benefit was received by DTE Electric customers." This calculation showed that DTE incurred $12 million in Zonal Deliverability Charges (ZDCs) and that DTE received $6.1 million in ZDBs that were returned to customers.

Burgdorf further testified:

> Witness Dauphinais incorrectly assessed [DTE's] capacity-related MISO expense variance by failing to account for both the Zonal Deliverability Charge (ZDC) and the Zonal Deliverability Benefit ("ZDB"). DTE was assessed both the ZDC and ZDB (which are included in the capacity cost line item) due to the separation in the Annual Clearing Prices (ACP) between Zone 7 and all other Local Resource Zones (LRZ). The ZDC is calculated as the difference between the ACP in the LRZ where the Load Serving Entity has a Planning Resource Margin Requirement obligation and the ACP in the LRZ where the Zonal Resource Credit ("ZRC") associated with the Fixed Resource Adequacy Plan (FRAP) is physically located multiplied by the volume of the FRAP. For the 2020-2021 PRA, DTE utilized 200 ZRCs of Zone 4 resources and 15.8 ZRCs of Zone 2 resources. Both the ZDC and the ZDB . . . are part of MISO's FERC [Federal Energy Regulatory Commission] approved Tariff that are included in the total capacity settlements directly received from the MISO statements.

Therefore, Burgdorf did not believe that the PSC should disallow any of DTE's proposed capacity costs. "All FERC approved MISO charges and credits were correctly applied according to the MISO Tariff. Witness Dauphinais'[s] proposed disallowance of $5.8 million for 2020 MISO ZDB credits is not proper as I have shown that those credits were already given back to customers."

Following the evidentiary hearing, the parties provided briefing regarding the relevant issues. On July 18, 2022, ALJ Feldman issued a proposal for decision (PFD) recommending that the PSC approve DTE's proposed reconciliation with certain modifications. In addressing the Ludington Unit 3 outage extension, ALJ Feldman noted that MCL 460.6j(13)(c)

> requires DTE Electric to show by clear and satisfactory evidence that an outage of over 90 days was not caused or prolonged by the utility's negligence or by unreasonable or imprudent management. While DTE Electric contends that its actions were reasonable and prudent, it undeniably permitted the flawed DRE to be installed, or at least attempt to be installed. While DTE Electric blames the contractor, DTE Electric has not established that the design and manufacturing errors could not have been detected sooner; instead, it has only established that DTE Electric and Consumers Energy were involved at least in monitoring the design, manufacturing, and installation processes, that some testing was performed prior to the installation, and that eventually efforts at repair were abandoned and a new DRE manufactured. While the record contains a root cause analysis of the manufacturer's errors, missing is a "root cause analysis" of the failure to detect the deficiencies at an earlier point in time. Instead, key to DTE Electric's explanation of the reasonableness and prudence of the steps it took are the protections built into the contract [with Toshiba] and [DTE's] efforts, along with Consumers Energy, to enforce those provisions.

ALJ Feldman recommended that DTE be disallowed from recovering power supply costs related to the Ludington Unit 3 outage extension but that DTE be permitted to keep a portion of any liquidated damages recovered from Toshiba in order to offset the disallowance.

ALJ Feldman noted that the "Staff, the Attorney General, and ABATE agree that the $1.14 million reflects the net replacement cost of energy during the outage extension, while ABATE also argues for an additional allowance [sic: disallowance] to reflect increased capacity costs resulting from the outage." Although DTE objected to any disallowance, DTE had not directly challenged the accuracy of the $1.14 million figure. ALJ Feldman quoted testimony from Coppola indicating that " 'the correct cost of replacement power for 2020 due to the extended outage is $1,141,335.' " ALJ Feldman rejected ABATE's argument for an additional disallowance of capacity costs:

> Regarding the potential additional disallowance of capacity costs, this PFD finds that ABATE has not established that DTE Electric incurred additional capacity costs as a result of the Ludington outage in 2020. As Mr. Coppola explained, many factors determine the MISO auction clearing capacity prices and the ZDB and ZRCs received by and charged to the utilities. It is unclear what portion, if any, of the $14.1 million increase in capacity-related costs over the plan case projection that the Ludington [U]nit 3 outage extension caused. DTE Electric's suggestion that a portion of the ZDB credits within this variance should offset the

disallowance, without any recognition of increased capacity costs, is unpersuasive. Thus, this PFD concludes that $1.14 million attributable to the Ludington [U]nit 3 outage extension should be disallowed, with the utility allowed to offset this amount against damage payments received from the contractor.

ABATE and DTE each filed exceptions to the PFD. On October 27, 2022, the PSC issued its order approving with modifications DTE's application for reconciliation of power supply costs and revenues for 2020. As relevant to this appeal, the PSC agreed with ALJ Feldman that "the record evidence in this case demonstrates that DTE Electric was 'involved in monitoring the design, manufacturing, and installation processes, that some testing was performed prior to the installation, and that eventually efforts at repair were abandoned and a new DRE manufactured.' " DTE had "failed to demonstrate by clear and satisfactory evidence that the outage was not caused or prolonged by the utility's unreasonable or imprudent management, as required by statute to avoid disallowance." It was undisputed that DTE had "incurred $1,141,335 in replacement power costs due to the extended outage at Ludington Unit 3." The PSC thus adopted ALJ Feldman's recommendation to disallow this portion of the costs.

The PSC further stated that DTE had made reasonable efforts to recover damages from Toshiba for manufacturing and installing the defective DRE. Therefore, DTE could "offset the $1.141 million disallowance with a portion of the liquidated damages received from the contractor as a result of these efforts." This "offset will occur in the context of DTE Electric's next general electric rate case and will have the effect of reducing the $1.141 million disallowance issued in the present case."

The PSC rejected ABATE's argument for an additional disallowance of capacity costs:

> Regarding the additional disallowance for capacity costs proposed by ABATE, the Commission continues to find the argument that DTE Electric incurred additional capacity costs as a direct result of the Ludington Unit 3 outage extension unpersuasive. As the Commission stated in its August 11[, 2022] order in [Consumers Energy's] 2020 PSCR reconciliation, "it cannot be ascertained from the record evidence that the Unit 3 outage extension was the sole reason for the 2020/2021 clearing pricing being set at CONE, or that even if it was the sole cause, offsetting the disallowance would be appropriate."[4] As the ALJ, Attorney General, and DTE Electric noted in the present case, "the MISO auction process involves several generating resources in Michigan's Lower Peninsula and other factors that can have a profound effect on the outcome of the auction price." Thus, the Commission adopts the recommendation of the ALJ and disallows the $1,141,355 attributable to DTE Electric's replacement energy costs caused by the outage at Ludington Unit 3 and finds that the utility may offset this amount against damage payments received from the contractor. [Citations omitted.]

---

[4] This Court's recent published opinion in *In re Application of Consumers Energy Co for Reconciliation*, which was summarized earlier, involved Consumers Energy's appeal and ABATE's cross-appeal from the August 11, 2022 order referenced in the PSC's order in this case.

On November 28, 2022, ABATE filed a petition for rehearing. ABATE argued that the PSC had erred by rejecting ABATE's argument for a disallowance of capacity costs. ABATE argued that all costs attributable to the Ludington Unit 3 outage extension must be considered in determining net increased costs and that the PSC had incorrectly read the word "solely" into the text of MCL 460.6j(13)(c) by saying that it could not be determined that the outage extension was the sole cause of the increased 2020-2021 auction price for capacity. ABATE contended that the PSC did not try to calculate the amount of replacement capacity costs incurred by DTE as a result of the outage extension. ABATE argued that, if there was insufficient evidence to determine whether DTE incurred additional capacity costs as a result of the outage extension or the amount of those costs, then the PSC should reopen the proceeding for further fact-finding.

On January 19, 2023, the PSC issued an order denying ABATE's petition for rehearing. The PSC noted that ALJ Feldman "thoroughly considered ABATE's initial arguments regarding capacity-related revenues and ZDB credits." The PSC observed that ALJ Feldman "was persuaded by the arguments put forth by the Attorney General and DTE Electric that multiple factors led the MISO PRA capacity clearing price to reach CONE." ALJ Feldman also agreed with the Attorney General that, if ABATE's theory was correct, then a similar high price should have been caused for the 2021-2022 PRA but that, in fact, the auction price dropped from $257.53 to $5 for the 2021-2022 PRA. This decrease in the auction price from the prior year further supported the conclusion "that the $257.53 auction price in the 2020/2021 PRA and related ZDB credits cannot be attributed to the Ludington 3 extended outage contrary to Mr. Dauphinais'[s] conclusion." (Quotation marks and citations omitted.) The PSC noted that ALJ Feldman "adopted the position of the Attorney General that the MISO auction process involves other generating resources and other factors that can have a profound effect on the outcome of the auction price."

The PSC continued:

> In its petition [for rehearing], ABATE focuses on specific language from the PFD and October 27[, 2022] order without properly addressing the findings in the record as a whole on the issues related to ZDB credits and capacity-related revenues. ABATE does not allege in its petition that there is newly discovered evidence or that unintended consequences result from compliance with the decision, as required by [Mich Admin Code, R 792.10437(1), the administrative rule governing petitions for rehearing]. The Commission finds that the record clearly addresses ABATE's arguments and that it committed no error in adopting the ALJ's recommendation on the issue.

The PSC thus denied ABATE's petition for rehearing. This appeal ensued.

## II. STANDARD OF REVIEW

"A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record." *In re Application of Consumers Energy Co for Reconciliation*, ___ Mich App at ___; slip op at 4 (quotation marks and citation omitted). An aggrieved party is required "to show by clear and satisfactory evidence that the order of the [PSC] complained of is unlawful or unreasonable." MCL 462.26(8).

To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. This Court accords due deference to the PSC's administrative expertise and is not to substitute its judgment for that of the PSC. An order of the PSC is unreasonable if it is not supported by the evidence, and the PSC's findings of fact are entitled to deference. [*In re Application of Consumers Energy Co for Reconciliation*, ___ Mich App at ___; slip op at 4 (quotation marks and citations omitted).]

"Issues of statutory interpretation are reviewed de novo." *Id*. at 5 (quotation marks and citation omitted). "A reviewing court should give respectful consideration to an administrative agency's interpretation of statutes it is obliged to execute, but not deference." *In re Application of Consumers Energy Co to Increase Rates*, 338 Mich App 239, 243; 979 NW2d 702 (2021), citing *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 108; 754 NW2d 259 (2008). "If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *In re Application of Consumers Energy Co for Reconciliation*, ___ Mich App at ___; slip op at 5 (quotation marks and citation omitted).

## III. ANALYSIS

ABATE first argues that the PSC erroneously limited the term "net increased costs" as used in MCL 460.6j(13)(c) to net increased costs that are *solely* attributable to an extended outage. ABATE asserts that the PSC improperly read the word "solely" into the statutory text so that only costs *solely* attributable to an extended outage are considered. ABATE's argument is unavailing.

MCL 460.6j(13)(c) requires a disallowance of

net increased costs attributable to a generating plant outage of more than 90 days in duration unless the utility demonstrates by clear and satisfactory evidence that the outage, or any part of the outage, was not caused or prolonged by the utility's negligence or by unreasonable or imprudent management.

Contrary to ABATE's argument, the PSC did not insert the word "solely" into the statutory text. It is true that the PSC used the word "sole" in the context of quoting the PSC's August 11, 2022 order in Consumers Energy's reconciliation case for the proposition that it could not " 'be ascertained from the record evidence that the Unit 3 outage extension was the sole reason for the 2020/2021 clearing pricing being set at CONE, or that even if it was the sole cause, offsetting the disallowance would be appropriate.' " But the PSC was not purporting to interpret MCL 460.6j(13)(c) to include the word "sole" or "solely." Rather, the PSC's overall analysis reflects that it properly applied the statutory text. The PSC thoroughly analyzed the relevant testimony, the parties' arguments, and the ALJ's findings. The PSC found ABATE's "argument that DTE Electric incurred additional capacity costs as a direct result of the Ludington Unit 3 outage extension unpersuasive." The PSC explained, "As the ALJ, Attorney General, and DTE Electric noted in the present case, the MISO auction process involves several generating resources in Michigan's Lower Peninsula and other factors that can have a profound effect on the outcome of the auction price." (Quotation marks and citations omitted.) And in denying ABATE's petition for rehearing, the PSC aptly noted that ABATE was "focus[ing] on specific language from the

PFD and October 27[, 2022] order without properly addressing the findings in the record as a whole . . . ." The PSC found "that the record clearly addresses ABATE's arguments and that [the PSC] committed no error in adopting the ALJ's recommendation on the issue." Overall, ABATE's argument that the PSC's analysis was premised on the insertion of the word "solely" into the statutory text lacks merit.

ABATE next argues that the PSC disregarded or did not adequately consider evidence that DTE incurred replacement capacity costs and ZDCs that should have been disallowed because such costs were attributable to the Ludington Unit 3 outage extension. ABATE further asserts that the calculation of net increased costs should have accounted for ZDB credits that DTE allegedly earned as a result of the outage extension. ABATE's argument is unconvincing.

The record contains competent, material, and substantial evidence that supports the PSC's decision. Attorney General witness Coppola provided detailed testimony explaining what he viewed as the flaws in ABATE witness Dauphinais's testimony. Dauphinais testified that DTE had received ZDB credits and incurred certain capacity-related costs in 2020 due to the Ludington Unit 3 outage extension. However, Coppola testified that Dauphinais's testimony was premised on speculative assumptions. Coppola explained that Dauphinais had incorrectly assumed "that the Ludington 3 extended outage and exclusion of the related capacity from the 2020/2021 MISO PRA was the cause of the run-up in the auction price and the resulting ZDB credits received by [DTE]." Coppola noted that MISO had not attributed any portion of the capacity shortage or the spike in the capacity price for the 2020-2021 auction to the Ludington Unit 3 outage extension. Coppola further quoted detailed discovery responses provided by DTE reflecting that DTE was "not attributing the high auction price, and thus the related ZDB credits in the 2020/2021 MISO planning year, to the Ludington 3 extended outage." Coppola explained that there was "no direct evidence to support Mr. Dauphinais'[s] assumptions, calculations and conclusions in his direct testimony."

Coppola further testified that the Ludington Unit 3 capacity was excluded not only from the 2020-2021 MISO PRA but also from the 2021-2022 MISO PRA because DTE "expected the outage to extend more than 120 days past the start of the 2021/2022 MISO planning year starting June 1, 2021." Coppola explained:

> For the 2021/2022 PRA, the capacity auction price for Zone 7 reverted back to $5.00 per MW/day, which matched the price for most of the other zones in the MISO territory. If the Ludington 3 extended outage had been the cause of the auction price run-up to $257.53 in Zone 7 in the 2020/2021 PRA, it should also have caused a similar high price in the 2021/2022 PRA. However, despite the fact the Ludington 3 generating capacity was not included in the 2021/2022 PRA, the auction price dropped to $5.00 from $257.53 in the prior year. This is another indication that the $257.53 auction price in the 2020/2021 PRA and the related ZDB credits cannot be attributed to the Ludington 3 extended outage, contrary to Mr. Dauphinais'[s] conclusion. The MISO auction process involves several generating resources in the Michigan Lower Peninsula and other factors, such as Capacity Import Limits (CIL) and export limits, which can have a profound effect on the outcome of the auction price.

Coppola thus opined that Dauphinais had incorrectly assumed "that the Ludington 3 extended outage and exclusion of the related capacity from the 2020/2021 MISO PRA was the cause of the run-up in the auction price and the resulting ZDB credits received by [DTE]." There were "no determinative findings in [Dauphinais's] testimony about any direct link between the Ludington 3 outage and the 2020/2021 PRA price." Dauphinais "simply speculates about a connection between the Ludington 3 capacity not being included in the 2020/2021 auction and the ZDB credits received by [DTE] in 2020."

DTE witness Burgdorf testified that he did not believe that the PSC should disallow any of DTE's proposed capacity costs. He explained: "All FERC approved MISO charges and credits were correctly applied according to the MISO Tariff. Witness Dauphinais'[s] proposed disallowance of $5.8 million for 2020 MISO ZDB credits is not proper as I have shown that those credits were already given back to customers."

The PSC found ABATE's argument for an additional disallowance to be unpersuasive. The PSC's decision was supported by the testimony of Coppola and Burgdorf. "Substantial evidence is evidence that a reasoning mind would accept as sufficient to support a conclusion. The [PSC] is entitled to weigh conflicting evidence and opinion testimony in order to determine in which direction the evidence preponderates." *In re Antrim Shale Formation re Operation of Wells Under Vacuum*, 319 Mich App 175, 181; 899 NW2d 799 (2017) (quotation marks and citation omitted). "[T]he testimony of one expert constitutes substantial evidence, and the [PSC] is entitled to accept it even if contrary evidence exists." *Id.* at 184. "It is for the [PSC] to weigh the conflicting expert testimony, and it may rely on expert testimony for its findings. When a finding is so supported, this Court will not substitute its judgment for that of the [PSC]." *Consumers Power Co v Pub Serv Comm*, 196 Mich App 687, 691; 493 NW2d 424 (1992) (citations omitted). The PSC was therefore entitled to accept the testimony of Coppola and Burgdorf over that of Dauphinais on this issue. Overall, the PSC's decision was not unlawful or unreasonable.

ABATE suggests that the case should, at a minimum, be remanded to the PSC to conduct an adequate investigation regarding whether replacement capacity costs, ZDB credits, and ZDCs were attributable to the Ludington Unit 3 outage extension. But ABATE has already been afforded ample opportunity to present evidence to support its position. As discussed, there was competent, material, and substantial evidence to support the PSC's rejection of ABATE's theory. ABATE has not established that it is entitled to have the case remanded to the PSC for further investigation.

Finally, ABATE argues that the PSC erred in denying ABATE's petition for rehearing. ABATE contends that the PSC improperly disregarded the costs of replacement capacity in calculating the total disallowance and that the PSC appears to have improperly conflated treatment of replacement capacity costs with treatment of ZDCs. ABATE's argument is unavailing.

ABATE fails to establish that the PSC improperly conflated treatment of distinct cost items. We discern no improper conflation in the PSC's analysis. As for ABATE's contention that the PSC disregarded the costs of replacement capacity, ABATE refers to the testimony of DTE witness Burgdorf that DTE "purchased 69 MW of one-time, short-term capacity through the MISO Planning Resource Auction (PRA) for Planning Year 2020-2021." But the fact that a purchase was made does not by itself necessarily mean that the purchase was attributable to the Ludington Unit 3 outage extension, as required for a disallowance under MCL 460.6j(13)(c). Dauphinais's

-15-

testimony may suggest a causal relationship, but as noted, his analysis was disputed by other expert witnesses. The PSC indicated that it was not persuaded that DTE incurred additional capacity costs as a result of the Ludington Unit 3 outage extension. The PSC adopted the recommendation of the ALJ, who found "that ABATE has not established that DTE Electric incurred additional capacity costs as a result of the Ludington outage in 2020." The ALJ found it "unclear what portion, if any, of the . . . increase in capacity-related costs over the plan case projection that the Ludington [U]nit 3 outage extension caused." It was for the PSC to weigh the testimony and to determine in which direction the evidence preponderated. *In re Antrim Shale Formation re Operation of Wells Under Vacuum*, 319 Mich App at 181. This Court does not substitute its judgment for that of the PSC on such matters. *Consumers Power Co*, 196 Mich App at 691.

Accordingly, the PSC did not err in denying ABATE's petition for rehearing. The PSC reasonably found "that the record clearly addresses ABATE's arguments and that [the PSC] committed no error in adopting the ALJ's recommendation on the issue."

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Kirsten Frank Kelly
/s/ James Robert Redford